[No. G041638. Fourth Dist., Div. Three. Dec. 10, 2009.]

ALICIA M. HABERMAN, Plaintiff and Appellant, v.
CENGAGE LEARNING, INC., et al., Defendants and Respondents.

COUNSEL

Law Office of Elva P. Kopacz and Elva P. Kopacz for Plaintiff and Appellant.

Epstein Becker & Green, James A. Goodman and Tae Kim for Defendants and Respondents.

OPINION

FYBEL, J.—

### INTRODUCTION

Plaintiff Alicia M. Haberman appeals from a summary judgment entered in favor of her former employer, Cengage Learning, Inc. (Cengage), her former supervisor, Rick Reed, and Cengage's national sales manager, Eric Bredenberg

(collectively referred to as defendants) as to her claims for sexual harassment, retaliation, breach of contract, and intentional infliction of emotional distress. The trial court granted defendants' motions for summary judgment on grounds including (1) defendants' alleged wrongful conduct was neither severe nor pervasive and did not create a hostile work environment as a matter of law; (2) no evidence showed a causal link between any alleged adverse employment action suffered by Haberman and any complaint by Haberman of sexual harassment; and (3) no evidence showed Haberman was subjected to extreme or outrageous conduct.

We affirm. The trial court did not err by granting defendants' motions for summary judgment because the acts of alleged harassment did not rise to the level of establishing a hostile work environment as a matter of law. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1048–1049 [95 Cal.Rptr.3d 636, 209 P.3d 963] (*Hughes*).) No evidence showed Haberman suffered any adverse employment action because she complained about sexual harassment. Although Cengage placed Haberman on a performance improvement plan (PIP) in October 2007, the undisputed evidence showed that decision was based on her failure to meet her annual sales goals for three years; no evidence in the record showed the decision makers in this regard were aware of any complaints of sexual harassment by Haberman at the time. Summary judgment was also properly granted because the record does not contain any evidence showing Haberman was subjected to "extreme or outrageous conduct" by defendants as a matter of law. (*Hughes, supra*, 46 Cal.4th at p. 1051.)

## SUMMARY OF UNDISPUTED FACTS AND CHRONOLOGY

In February 2004, Haberman began her employment as a sales representative for Cengage, a textbook publishing company. At the beginning of her employment, Haberman directly reported to Christina Pineda Kinsky. Bredenberg was Cengage's national sales manager. His duties included managing regional and district sales managers who in turn were responsible for managing the sales representatives within their assigned regions.

### I.

### 2005

The record contains evidence of contacts between Haberman and Bredenberg during Haberman's employment at Cengage. The first three relevant contacts occurred in 2005. First, at a conference, Bredenberg stated to Haberman, "[w]ow. You look so pretty. How do you look so good so early in the

morning?" Second, during the same conference, Bredenberg talked to Haberman about his wife's recurrent battle with cancer and said "something to the effect" that "I think next time around, I'm going to go for the younger ones because when women are in their 40s, they get sick." Third, Bredenberg commented to Haberman that a certain school administrator was "pretty hot for being an older woman."

## II.

### 2006

In August 2006, Haberman was present at a national sales meeting conducted by Bredenberg when he joked to a group of about 30 to 40 men and women that his father, Richard, was referred to as "Big Dick," as opposed to Bredenberg, whose official first name is also Richard. In August or September, in response to a customer's compliment of Haberman, Bredenberg stated that Haberman was amazing and had five children with no father in the picture. In the fall or winter, Pineda Kinsky asked Haberman whether she was seeing Bredenberg, because he had remarked that Haberman was " 'drop dead' gorgeous."

Haberman wrote to Bredenberg on October 13, 2006, thanking him for agreeing to conduct a sales presentation for her. She wrote: "Oh thank you Eric! You are too good! HAVE A GREAT WEEKEND!"

## III.

### February–May 2007

On February 15, 2007, Haberman sent Bredenberg an e-mail in which she stated in part: "Thanks for a wonderful Valentine's day. [¶] I was lucky I got to spend it with you! [¶] Have a great weekend in Mexico." On that same day, Bredenberg responded by e-mail, stating, "I gave the valentine chocolate to my good friend Harry tonight. I told him it was from a gorgeous strawberry blonde. He got all excited! He said at his age that [he] doesn't get valentines anymore (he's about 60)." Haberman responded: "Thanks, I appreciate that compliment coming from you. [¶] I'm happy you shared that with him. How funny! [¶] Now you need to tell me what you do like so I can replace the chocolate with something else like peanut butter cookies, sugar cookies??? [¶] My weakness is frosted sugar cookies. White sugar is so taboo, but why is it that some of the bad things for us are so good? [¶] I just buy the carrot cake Cliff bars from Mother's and they aren't too bad."

On March 12, 2007, while they were separately parking for a convention, Bredenberg called Haberman on her cell phone and told her something to the effect that he was coming right up behind her and that it felt pretty good. During the convention, Haberman took pictures of Bredenberg in a muscle pose. During that same convention, Bredenberg took a picture of Haberman laughing at him because he had hung up posters which had dropped. Bredenberg took another picture of Haberman smiling (although Haberman testified at her deposition that she was smiling in the picture, but was not happy).

On March 21, 2007, Bredenberg attached the picture of Haberman smiling as the "Picture of the Week" to his weekly "EB Update" in which he summarized the conference and commended Haberman's booth presentation. On March 21, Haberman wrote to Bredenberg: "Thanks for the nomination for picture of the week at the last conference. [¶] Although, I think the picture of the week should have been the muscle pose of you!!! [¶] DO YOU HAVE ME ON YOUR CALENDAR?? [¶] I was just wondering if you still have me on your calendar for March 27th, Next Tuesday for the Rafu Center Presentation from 8–9 pm? [¶] . . . [¶] The address of Rafu is 1650 Morton Avenue, LA, 90026. We could also go together if you want me to pick you up?"

On March 26, Reed became employed by Cengage as the district sales manager for the southwest district. Haberman began reporting directly to Reed at this time and continued to report to him until the end of her employment with Cengage. At a conference in March, Reed, who had just started working for Cengage, commented that he wanted to bring his "guys" in and that "we all want to bring our guys in."[1]

In late March, Dennis Hogan, president of Cengage,[2] told Reed that Haberman had not reached her annual sales goal during the two previous years and that Reed needed to monitor her sales efforts to ensure she met her sales goal in 2007.[3] Reed twice spoke with Haberman about her sales

---

[1] Haberman testified she understood Reed's comment to mean he wanted to bring his own *men* into the company and possibly replace a current employee or two; she testified, "when someone says he wants to bring his own guys in, I feel that I'm being discriminated against because I'm a female."

[2] The record states Hogan was president of "Heinle/ELT." In the opening brief, Haberman explains that "Cengage was known as Heinle/ELT-Cengage Learning when Haberman was first employed by them. At the time Haberman initiated her suit, the corporation was known as Heinle/ELT-Thomson Learning, Inc."

[3] Cengage sales representatives' goals are based upon net sales which are calculated by taking gross sales and reducing that amount by any returns. The sales representatives' goals are different and individually calculated based upon factors which include sales history, size of territory, number of schools in a particular territory, and attrition rates within school districts. Haberman did not reach her net sales goal for either 2005 or 2006.

performance in April because of his concern she had not made her goal for two years. Reed sent Haberman an e-mail on April 17, summarizing their later conversation. Reed copied Bredenberg on the e-mail.

At the end of a conference in mid-April, Bredenberg told Haberman that one of the textbook authors had "the 'hots' " for her and asked whether she or Laurie Avery, another Cengage sales representative, would ever go out with the author. On May 16, while Bredenberg and Haberman were driving to an appointment together, Bredenberg told her that his grief counselor had told him not to make any changes for one year, he. was not ready for a relationship and he just wanted to have sex; Bredenberg asked Haberman how she knew whether someone was good in bed.[4]

## IV.

### June 2007

On June 1, 2007, Reed sent Haberman an e-mail (in which he again copied Bredenberg), stating that Haberman's current sales deficiency and growing gap were alarming and that "immediate and pressing sales action is needed." Reed outlined action items they had already discussed and further advised Haberman, "we cannot allow this sales gap to widen and continue too much longer as it will impact the region and the nation owing to California's percentage of total goal."

On June 13, Reed sent Haberman an e-mail asking her to provide him a document detailing her weekly activities and calls so that he could see how her week was "shaping up." Reed told Haberman she should reach at least 30 to 35 percent of her annual sales goal by the end of June 2007.

## V.

### July 2007

On July 13, 2007, Reed e-mailed to Bredenberg, Haberman, and Avery an agenda for a role-playing training evaluation session that was to take place on July 26. The agenda described three different sales scenarios with scripts for Haberman and Avery to use in interacting with Bredenberg (acting as the gatekeeper) and Reed (acting as the decision maker). Bredenberg and Reed decided to conduct the training at Bredenberg's house to save money and

---

[4] In Bredenberg's declaration filed in support of his motion for summary judgment, he stated his wife had passed away in November 2006.

because it was centrally located and Bredenberg wanted to show his coworkers his newly remodeled home. It is undisputed that Bredenberg, Haberman, and Cengage sales representatives in general work out of their home offices. At some point during the session, Bredenberg commented that "we don't get pretty girls like you coming around here very often." Haberman was required to approach Reed inside Bredenberg's home office during the session.

During lunch on July 26, Reed told Bredenberg, Haberman, and Avery that at his wife's 50th birthday party, his wife's friend was following Bredenberg and wanted to date him. As Haberman was leaving Bredenberg's house, Bredenberg asked Haberman, in Reed's presence, whether she had any friends who just wanted to have sex.

On July 30, Reed asked Haberman if she planned to bring her boyfriend to the company dinner. After Haberman asked Reed why he asked that question, Reed responded that she was going to disappoint a few men in the company. On an unspecified date in 2007, Bredenberg asked Haberman whether she was getting married.

## VI.

### August 2007

On August 4, 2007, Reed e-mailed Haberman that he wanted to create an action plan as to her sales goals. Reed stated, "[y]ou can imagine the trepidation regarding your current gap. I have to believe that your plan will at least demonstrate the greatest effort possible to make [your] goal. We are counting on your territory to have a great surge and need to be sure that your schedule absolutely reflects that end."

On August 16, Haberman asked Bredenberg via an e-mail to conduct a sales presentation for a school in her territory. After Bredenberg agreed, Haberman responded, "[t]hanks a million!!" That same day, Haberman asked Bredenberg to conduct another presentation. Bredenberg responded by e-mail: "Sign me up. Greetings from humid Houston." Haberman replied: "Great! Thank you! Stay cool, Humid Houston is about right . . . . Yuck!"

By August 23, Haberman had not reached 43 percent of her annual sales goal. Hogan, Bredenberg, and vice-president, John McHugh, participated in a conference call to discuss how far each sales representative was from reaching his or her annual sales goal and to discuss each representative's fall sales plan. They discussed Haberman's sales history, performance, efforts, and "gap to goal." They discussed Haberman's failure to meet her annual sales goals in 2005 and 2006. Hogan recommended placing Haberman on a PIP.

After the conference call, Bredenberg told Reed that they needed to place Haberman on a PIP. Reed told Bredenberg that Haberman had identified a large potential sale in her territory and recommended they give Haberman until September 30, 2007, to increase her sales to 65 percent of her annual sales goal and that, if she failed to do so, she then be placed on a PIP. Bredenberg agreed.

## VII.

### SEPTEMBER 2007

On September 7, 2007, Haberman sent an e-mail to Bredenberg, stating, "it is always great to work with you! You were great. . . ." Sometime between September 1 and 9, Haberman complained to Reed for the first time that she was being harassed. Haberman did not provide any details or examples, except that she specifically complained about an e-mail she had received from Reed on August 7, in which Reed told her, "we cannot afford surprises and your schedule and effort needs to be very transparent and productive."

On September 10, Reed spoke with Haberman about her sales efforts and told her that if she did not increase her sales to 65 percent of her 2007 annual sales goal, she would be placed on a PIP. By September 30, Haberman's sales were at 46 percent of her 2007 annual sales goal.

## VIII.

### OCTOBER 2007–AUGUST 2008

On October 8, 2007, Haberman sent an e-mail to Bredenberg about a Long Beach conference and wrote, "[h]i Eric, Hope you enjoyed your vaca w/your n[ie]ce! Back to reality ha?" On October 10, Reed placed Haberman on a PIP.

Haberman contacted Kristin McDaniel in the human resources department on October 12, and told her she had received a PIP, she had had "enough," and she was being harassed. McDaniel told her she would investigate and wanted to schedule a time for them to discuss Haberman's complaint. Haberman told McDaniel that she did not want to provide specific details at that time and would send something in writing.

On October 13, Bredenberg told Haberman that a customer's contractor had the "hots" for her and wanted to date her. Two days later, Haberman complained to Reed that she felt she was being harassed and that Bredenberg

had engaged in inappropriate conduct toward her. Haberman mentioned Bredenberg's comment on July 26, 2007, asking Haberman whether she had any friends who just wanted to have sex. She also mentioned that Bredenberg had told a customer that she was amazing and had five children with no father in the picture. That same day, Reed called McDaniel to report Haberman's complaint.[5]

Haberman submitted a travel and expense reimbursement request dated October 22, 2007. The travel and expense system flagged Haberman's request for Reed's review. It was determined that Haberman's $4,368.06 request included $3,000 in expenses for personal charges for which she was not entitled to reimbursement.[6] Haberman removed the personal charges from her request and resubmitted it. After Reed clarified that Haberman's request sought, inter alia, reimbursement for three meals in a single day, Reed approved Haberman's request on November 13, and Haberman was fully reimbursed.

Haberman took a medical leave of absence beginning on November 5, 2007. She never returned to work at Cengage and her employment was terminated effective August 31, 2008.

## PROCEDURAL HISTORY

In November 2007, Haberman filed a complaint alleging claims for (1) sexual harassment in violation of the California Fair Employment and Housing Act (FEHA)[7] against defendants; (2) retaliation against Reed, Bredenberg and Cengage (although Haberman later dismissed this claim as alleged against Reed and Bredenberg); (3) breach of contract against Cengage; and (4) intentional infliction of emotional distress against Reed and Bredenberg. Defendants filed separate motions for summary judgment.

---

[5] Haberman stated she first complained of sexual harassment by Bredenberg to Pineda Kinsky in 2005 and again in 2006, and was led to believe from Pineda Kinsky's comments that she would be fired if she complained to the human resources department regarding Bredenberg's sexual harassment. Pineda Kinsky refuted Haberman's contention. It is undisputed, however, that Pineda Kinsky was not involved in the decision to place Haberman on a PIP and did not report any of Haberman's alleged complaints of sexual harassment to anyone at Cengage.

[6] In the opening brief, Haberman explains that, in 2007, Cengage made changes to its expense accounting software which created some confusion among employees. She asserts that, prior to the change, certain employees were allowed to charge personal expenses on a corporate credit card as long as those expenses were deducted from the final expense report amount. She states, "[d]uring this confusing transition period, Reed delayed Haberman's expense accounts citing personal expenses which needed to be removed from the new reporting system."

[7] Government Code section 12940 et seq.

The trial court granted defendants' motions for summary judgment, stating in relevant part:

"After full consideration of the evidence, papers and pleadings on file herein, the separate statement of each party, and the authorities submitted by counsel, as well as counsel's oral argument, the Court finds there is no triable issue of material fact in this action and that the moving parties are entitled to summary judgment, as a matter of law, for the following reasons:

"1. Plaintiff cannot sustain her first cause of action for sexual harassment in violation of Cal. Gov. Code § 12940 . . . ('FEHA') against Reed because each of the acts she attributes to Reed did not create a hostile work environment as a matter of law. The acts she complains of, as a matter of law, did not constitute harassing conduct that was sexual in nature or based upon sex. . . .

"2. Plaintiff cannot sustain her first cause of action for sexual harassment in violation of FEHA against Bredenberg because each of the acts she attributes to Bredenberg did not create a hostile work environment as a matter of law. Four of the acts Plaintiff complains of were not harassing conduct that was sexual in nature or based upon sex. Each of the remaining acts she attributes to Bredenberg were not severe or pervasive enough to create a hostile work environment. . . .

"3. Plaintiff cannot sustain her first cause of action for sexual harassment in violation of FEHA against Cengage because this cause of action is based upon the same facts as she bases her cause of action against Bredenberg and Reed. For the reasons set forth above, Plaintiff cannot sustain her first cause of action against Bredenberg and Reed. As such, her first cause of action against Cengage also fails as a matter of law. . . .

"4. Plaintiff cannot sustain her second cause of action for retaliation in violation of FEHA against Cengage because Cengage's denial of one of her travel and expense reimbursement requests was not an adverse action, there is no evidence to establish a causal connection between Cengage's decision to place her on a Performance Improvement Plan ('PIP') and Plaintiff's complaints of sexual harassment where the decision to place her on a PIP was made before Plaintiff complained about sexual harassment to anyone involved in the decision to place her on the PIP and where there was no evidence to establish that the individuals involved in the decision to place her on a PIP were aware of any other complaints prior to making the decision to place her on a PIP. There is also no evidence to establish that Cengage's legitimate decision to place Plaintiff on a PIP was pretextual. . . .

"5. Plaintiff cannot sustain her third cause of action for breach of contract against Cengage because there is no evidence to establish that her employment was not an at-will employment relationship and there is no evidence that Plaintiff sustained any damages regarding the alleged breach. . . .

"6. Plaintiff cannot sustain her fourth cause of action for intentional infliction of emotional distress against Bredenberg and Reed because there is no evidence to establish that she was subjected to extreme or outrageous conduct and because this cause of action is barred by the workers' compensation rule of exclusivity."[8]

Judgment was entered in defendants' favor. Haberman appealed.

## DISCUSSION

### I.

#### BURDENS OF PROOF AND STANDARD OF REVIEW

" 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish, a prima facie case . . . ." [Citation.]' [Citation.] '[O]nce a moving defendant has "shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established," the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff "may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." [Citations.]' [Citation.]" (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 274 [42 Cal.Rptr.3d 2, 132 P.3d 211].)

"In reviewing a trial court's grant of summary judgment, we apply the following rules: ' "[W]e take the facts from the record that was before the trial court when it ruled on that motion" ' and ' " ' "review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " ' [Citation.] In addition, we ' "liberally construe the evidence in

---

[8] The court also overruled defendants' evidentiary objections asserted against Haberman's evidence; Haberman did not assert and therefore waived any evidentiary objections to defendants' supporting evidence.

support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Hughes, supra*, 46 Cal.4th at p. 1039.)

## II.

### THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT AS TO HABERMAN'S SEXUAL HARASSMENT CLAIM.

Haberman contends the trial court erred by granting summary judgment as to her sexual harassment claim, based on the court's conclusion defendants' alleged wrongful conduct did not constitute sexual harassment as a matter of law.

■ In *Hughes, supra*, 46 Cal.4th at pages 1042–1043, the California Supreme Court recently restated the framework of sexual harassment law in California: "Like federal law, California law prohibits sexual harassment in the workplace. Originally enacted in 1980, Government Code section 12940 is part of the FEHA. [Citation.] It defines 'an unlawful employment practice' as an employer's refusal to hire, employ, or select for a training program leading to employment, any person because of that person's 'race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, *sex*, age, or sexual orientation.' [Citation.] Since 1985, the FEHA has prohibited sexual harassment of an employee. [Citation.] [¶] With respect to sexual harassment in the workplace [citation], the prohibited conduct ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is 'hostile or abusive to employees because of their sex.' [Citation.] Thus, similar to the federal law's Title VII [title VII of the Civil Rights Act of 1964], California's FEHA 'recognize[s] two theories of liability for sexual harassment claims . . . ". . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." ' [Citations.]"

■ The Supreme Court further stated: "In construing California's FEHA, this court has held that the hostile work environment form of sexual harassment is actionable only when the harassing behavior is *pervasive* or *severe*. [Citation.] This limitation mirrors the federal courts' interpretation of Title VII. [Citation.] To prevail on a hostile work environment claim under California's FEHA, an employee must show that the harassing conduct was

'severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex.' [Citations.] There is no recovery 'for harassment that is occasional, isolated, sporadic, or trivial.' [Citation.] [¶] Courts that have construed federal and California employment discrimination laws have held that an employee seeking to prove sexual harassment based on no more than a few isolated incidents of harassing conduct must show that the conduct was 'severe in the extreme.' [Citations.] A single harassing incident involving 'physical violence or the threat thereof' may qualify as being severe in the extreme. [Citations.] [¶] Under California's FEHA, as under the federal law's Title VII, the existence of a hostile work environment depends upon 'the totality of the circumstances.' [Citation.] We said in *Lyle* [*v. Warner Brothers Television Productions*], *supra*, 38 Cal.4th at page 284, that '[t]o be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive . . . ." ' Therefore, 'a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail . . . if a reasonable person . . . , considering all the circumstances, would not share the same perception.' [Citation.]" (*Hughes, supra*, 46 Cal.4th at pp. 1043–1044.)

In *Hughes, supra*, 46 Cal.4th at page 1039, the defendant was one of the trustees of the $350 million trust provided by the plaintiff's late ex-husband for their son. On her son's behalf, the plaintiff requested that the trust provide $160,000 for a two-month rental of a beach house. (*Ibid.*) The trustees unanimously rejected the request but agreed to provide $80,000 for a one-month rental. (*Id.* at pp. 1039–1040.) Two weeks later, the defendant contacted the plaintiff to invite her son to attend a private showing at a museum. (*Id.* at p. 1040.) During that conversation, the defendant called the plaintiff " 'sweetie' " and " 'honey,' " and said he thought of her " 'in a special way, if you know what I mean.' " (*Ibid.*) After the plaintiff asked the defendant why the trustees had only authorized a one-month rental for the beach house, the defendant stated that he could be persuaded to cast his vote for an additional month if the plaintiff would be " 'nice' " to him. (*Ibid.*) The defendant told the plaintiff: " 'You know everyone always had a thing for you. You are one of the most beautiful, unattainable women in the world. Here's my home telephone number and call me when you're ready to give me what I want.' " (*Ibid.*) The plaintiff said the defendant's comments were " 'crazy,' " to which the defendant responded, " '[h]ow crazy do you want to get?' " (*Ibid.*)

That night, the plaintiff took her son to the museum where the defendant told her, " 'I'll get you on your knees eventually. I'm going to fuck you one way or another.' " (*Hughes, supra*, 46 Cal.4th at p. 1040.) The plaintiff sued the defendant for sexual harassment under Civil Code section 51.9 which provides for sexual harassment liability in the context of relationships

between providers of professional services and their clients. (*Hughes, supra*, 46 Cal.4th at pp. 1040, 1044–1046.) The trial court granted the defendant's motion for summary judgment and the appellate court affirmed. (*Id.* at p. 1040.)

On review, the California Supreme Court applied the same legal principles of sexual harassment law in the workplace to the plaintiff's claim for sexual harassment under Civil Code section 51.9, stating: "[T]he Legislature intended to conform Civil Code section 51.9 to the California and federal laws pertaining to sexual harassment in the workplace." (*Hughes, supra*, 46 Cal.4th at p. 1048.) Applying those principles, the Supreme Court concluded, "[h]ere, defendant's sexually harassing conduct, as plaintiff has described it, was not 'pervasive' within the meaning of Civil Code section 51.9—that is, it was not so egregious as to alter the conditions of the underlying professional relationship. [Citations.] To be *pervasive*, the sexually harassing conduct must consist of 'more than a few isolated incidents.' [Citation.] That standard has not been met here. As we have explained, the alleged sexual harassment consisted only of comments defendant made to plaintiff during a single telephone conversation and a brief statement defendant made to plaintiff in person later that day during a social event at a museum." (*Ibid.*)

The Supreme Court also concluded the defendant's conduct was not severe, stating: "[E]mployment law acknowledges that an isolated incident of harassing conduct may qualify as 'severe' when it consists of 'a *physical assault or the threat thereof*.' [Citations.] . . . Although vulgar and highly offensive, [the defendant's remark at the museum], which was made in the presence of other people attending a private showing at a museum, would not plausibly be construed by a reasonable trier of fact as a threat to commit a sexual assault on plaintiff. [Citation.] Most reasonably construed, defendant's comment was a threat, not of physical violence, but of financial retaliation: that he would use his power as a trustee to thwart plaintiff's requests to allocate funds from the trust established for her son Alex. But such a threat will not support a claim under [Civil Code] section 51.9 for the hostile environment form of sexual harassment, because it does not constitute 'severe' harassing conduct." (*Hughes, supra*, 46 Cal.4th at p. 1049.)

In *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 126–127 [68 Cal.Rptr.3d 568] (*Mokler*), a panel of this court concluded that a county employee's sexual harassment claim against a county supervisor failed because the employee's allegations of misconduct did not establish a hostile work environment as a matter of law. The appellate court stated: "Norby's harassment of Mokler occurred on three occasions over a five-week period, and involved no physical threats. The first occurred on January 29, 2003, at an offsite budget meeting. During the lunch break, Mokler approached Norby

and introduced herself. Norby asked about her marital status and called her an 'aging nun' when he learned she was not married. [¶] The second occurred on February 5, 2003, at a hotel celebration. There, Norby took Mokler by the arm, pulled her to his body, and asked, 'Did you come here to lobby me?' When she answered no, Norby . . . responded: 'Why not? These women are lobbying me.' He told Mokler she had a nice suit and nice legs, and looked up and down at her. [¶] The third occurred on March 3, 2003, at Norby's office. Norby told Mokler she looked nice and put his arm around her. He then asked Mokler where she lived, demanding to know her exact address. Norby again put his arm around Mokler and, as he did so, his arm rubbed against her breast. When Mokler tried discussing the services provided by [her department], Norby interrupted, stating: 'Why . . . do you have to do something special for Mexicans?' " (*Id.* at p. 144.)

The appellate court in *Mokler, supra*, 157 Cal.App.4th at pages 145–146 stated: "Following established precedent, we conclude these acts of harassment fall short of establishing 'a pattern of continuous, pervasive harassment' [citation], necessary to show a hostile working environment under FEHA. Norby did not supervise Mokler or work in the same building with her. The first incident involved no touching or sexual remarks; rather, Norby uttered an isolated but boorish comment on Mokler's marital status. The second incident did not occur at work, and involved a minor suggestive remark and nonsexual touching. The third incident involved touching when Norby placed his arm around Mokler and rubbed his arm against her breast in the process. The touching, however, was brief and did not constitute an extreme act of harassment. Norby's request for Mokler's home address was brazen, but this conduct falls short of what the law requires to establish a hostile work environment. Norby's derogatory statement regarding Mexicans was unmistakably foul and offensive, but not sexual. [¶] Taken as a whole, the foregoing acts demonstrate rude, inappropriate, and offensive behavior. To be actionable, however, a workplace must be ' "permeated with 'discriminatory intimidation, ridicule and insult,' [citation] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' [Citation.] The acts Mokler has alleged here are similar in scope to those found insufficient to constitute a hostile work environment in other cases. (See, e.g., *Quinn v. Green Tree Credit Corp.* (2d Cir. 1998) 159 F.3d 759, 768 [harasser's statement that plaintiff had been voted the ' "sleekest ass" ' in the office and single deliberate act of touching plaintiff's breasts with papers he was holding in his hand held insufficient]; *Weiss v. Coca-Cola Bottling Co. of Chicago* (7th Cir. 1993) 990 F.2d 333, 337 [insufficient where supervisor told plaintiff how beautiful she was, repeatedly asked her out, tried to kiss her on three separate occasions, put ' "I love you" ' signs on her work area, and touched her shoulder at least six times]; *Chamberlin v. 101 Realty, Inc.* (1st Cir. 1990) 915 F.2d 777, 783 [five

sexually motivated advances on plaintiff over a four- or five-week period held insufficient for hostile work environment].) [¶] While we do not condone Norby's improper behavior, Mokler failed to present sufficient evidence of acts ' " 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.' " ' "

■ Here, the acts of harassment alleged against Reed and the acts of harassment alleged against Bredenberg fall far short of "establishing 'a pattern of continuous, pervasive harassment' [citation], necessary to show a hostile working environment under FEHA." (*Mokler, supra,* 157 Cal.App.4th at p. 145.) Haberman's claim for sexual harassment against Cengage was entirely based on the allegations asserted against Reed and Bredenberg, and thus fails for the same reasons.

## A.

### *Haberman's Sexual Harassment Claim Against Reed*

Haberman's sexual harassment claim against Reed was based on the following six incidents: (1) at a conference in March 2007, Reed told her he wanted to bring his "guys" in, that "we all want to bring our guys in"; (2) Reed and Bredenberg planned the role-playing training evaluation session at Bredenberg's house on July 26, 2007; (3) while Reed, Haberman, Bredenberg, and Avery were having lunch on July 26, Reed told them that, at his wife's 50th birthday party, his wife's friend was following Bredenberg and wanted to date him; (4) Reed asked Haberman if she planned on bringing her boyfriend to the company dinner and stated that she was going to disappoint a few men in the company; (5) Reed rejected one of Haberman's travel and expense reimbursement requests; and (6) Reed placed her on a PIP on October 10, 2007.

Most of the alleged incidents involving Reed are not sexual in nature. Reed's March 2007 comment about bringing his "guys" into the company, Reed's rejection of Haberman's travel and expense reimbursement request, and Reed's placement of Haberman on a PIP in October 2007, albeit bad news for Haberman, did not constitute conduct based on sex or of a sexual nature.

Reed's conduct in planning and execution of the role-playing training session at Bredenberg's house was also not sexual in nature. It is undisputed that the training session was legitimate. Although Haberman was required as part of the role-playing exercise to approach Reed in Bredenberg's home office, which she claimed caused her significant distress, Haberman never alleged that Reed complimented her, asked her out, or expressed any interest in her.

While Reed, Bredenberg, Haberman, and Avery were eating lunch on the day of the role-playing training session, Reed mentioned that a woman at his wife's birthday party expressed interest in Bredenberg. Reed also told Haberman that a few male Cengage employees would be disappointed if she brought her boyfriend to the company dinner. Such comments, as a matter of law, do not even come close to "harassing conduct" that is " 'severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex.' " (*Hughes, supra*, 46 Cal.4th at p. 1043.) The trial court properly granted summary judgment as to Haberman's sexual harassment claim against Reed.

### B.

#### *Haberman's Sexual Harassment Claim Against Bredenberg*

Haberman's sexual harassment claim against Bredenberg is based on the following 13 instances of alleged harassment (identified in Bredenberg's separate statement and agreed to be the basis for Haberman's claim in her responsive separate statement) that occurred over a time period of two to three years: (1) at the 2005 conference, Bredenberg asked Haberman how she looked so pretty so early in the morning; (2) in 2005, Bredenberg spoke of his wife's recurrent battle with cancer and said he thought the next time around he would go for the younger ones because women in their 40's get sick; (3) in 2005, Bredenberg commented that a school administrator was "hot for being an older woman"; (4) in August or September 2006, in response to a customer's compliment of Haberman, Bredenberg told the customer that Haberman was amazing and had five children with no father in the picture; (5) at a conference in August 2006, he joked that his father, Richard, is referred to as "Big Dick," as opposed to Bredenberg (whose official first name is also Richard); (6) in the fall or winter of 2006, Pineda Kinsky asked Haberman whether she was seeing Bredenberg because he had said Haberman was " 'drop dead' gorgeous"; (7) on March 12, 2007, while they were separately parking for a convention, Bredenberg called Haberman on her cell phone and told her that he was coming right up behind her and it felt pretty good; (8) in 2007, Bredenberg asked Haberman if she was getting married; (9) in mid-April 2007 at the end of a conference, Bredenberg told her that an author of one of the textbooks they were selling had the "hots" for her and asked whether she or Avery would ever go out with the author; (10) on May 16, 2007, Bredenberg told Haberman that his grief counselor advised him not to make any changes for one year, said he was not ready for a relationship, and said he just wanted to have sex, and Bredenberg asked

Haberman what she thought, whether she had any friends who just wanted to have sex, and how she knew whether anyone was good in bed; (11) on July 26, 2007, Bredenberg and Reed conducted a role-playing training session at Bredenberg's house; (12) on July 26, 2007, Bredenberg asked Haberman if she had any friends who just wanted to have sex; and (13) on October 13, 2007, Bredenberg told her that a customer's contractor had the "hots" for her and wanted to date her.

Two of the 13 alleged instances of sexual harassment upon which Haberman bases her claim were not based on sex. First, Bredenberg's comment to a customer that Haberman was amazing and had five children with no father in the picture was not sexual in nature.

Second, as discussed *ante*, Haberman's required participation in the role-playing training session at Bredenberg's house was not in and of itself an incident based on sex. It is undisputed that Bredenberg, Haberman, and all Cengage sales representatives worked out of their home offices while employed by Cengage. It is undisputed Bredenberg and Reed decided to conduct the training session at Bredenberg's house because it was centrally located, it would save money, and Bredenberg wanted to show his coworkers his newly remodeled home.

The record also shows the role-playing training session was legitimate. About two weeks before the training session, Reed e-mailed an agenda to Haberman, outlining the role-playing training exercises and describing three different sales scenarios with scripts for Haberman and Avery to use as part of the role-play training session. Bredenberg played the role of the gatekeeper and Reed played the role of the decision maker. Haberman suggests in her appellate briefs that the training session was merely a ruse to isolate her in a back bedroom in Bredenberg's house. It is undisputed, however, that she met with Reed, not Bredenberg, in Bredenberg's home office.

Although Haberman does not contend that anything remotely sexual occurred during the role-playing training session itself, Haberman argues the training exercise was sexual in nature because there was bedroom furniture in the back bedroom where she was sent and because, in her opinion, there were other rooms in the house such as the kitchen, entryway, family room or living room which could have been used for the exercise instead. During her deposition, Haberman testified she believed the room to which she had been sent to participate in the role-playing session was Bredenberg's home office because she saw a desk and a computer and did not see a bed. In opposition to defendants' motions, Haberman submitted a declaration stating that the room "was furnished with bedroom furniture." Whether Bredenberg's home office contained bedroom furniture and whether the role-playing training

session could have taken place in a different room do not alone transform this training exercise into a sexual incident.

The undisputed evidence shows the remaining 11 instances of alleged sexual harassment constituted instances where Bredenberg made brief and isolated comments to Haberman over the course of a two- or three-year period. No instance of alleged sexual harassment involved any physical contact. Haberman did not allege Bredenberg ever propositioned her or even asked her out on a date. The record is devoid of any evidence that Bredenberg ever threatened her or used explicit language in her presence. Once, Bredenberg made a joke to a group while giving a presentation at a meeting that his father was called "Big Dick." But, as discussed *ante*, the FEHA is " 'not a "civility code" and [is] not designed to rid the workplace of vulgarity.' " (*Lyle v. Warner Brothers Television Productions, supra*, 38 Cal.4th at p. 295.)

Bredenberg twice briefly complimented Haberman's general appearance. At a 2005 conference, Bredenberg questioned how Haberman could look so pretty so early in the morning. In 2006, Pineda Kinsky told Haberman that Bredenberg had said Haberman was " 'drop dead' gorgeous," prompting Pineda Kinsky to ask Haberman whether she was seeing him.

Twice, Bredenberg informed Haberman that someone else had expressed interest in her. First, Bredenberg told Haberman at a conference in April 2007 that a textbook author "had the 'hots' for her" and asked whether she would ever go out with the author. And, in October 2007, Bredenberg informed her that a customer's contractor had the "hots" for her and wanted to date her. The record does not show that, during these instances, Bredenberg did anything more than pass on to Haberman this rather innocuous information he had received from those parties.

Once, in 2005, Bredenberg commented that a particular school administrator was "hot" for being an older woman. In 2007, he made a mild innuendo while talking on his cell phone to Haberman that he was coming up right behind her and that it felt pretty good. Once, in 2007, he asked Haberman if she was getting married. As discussed *ante*, to be actionable, alleged sexual harassment cannot be occasional, isolated, sporadic, or trivial; the plaintiff must show a concerted pattern of harassment of a repeated, routine, or generalized nature. (*Mokler, supra*, 157 Cal.App.4th at p. 142.) Here, the undisputed material facts show these alleged incidents of sexual harassment were indeed isolated, sporadic, and often trivial.

Finally, Haberman's sexual harassment claim also rests on comments Bredenberg made to Haberman about his wife's terminal illness and his

counselor's advice regarding Bredenberg's sex life following his wife's death. Sometime in 2005, Bredenberg told Haberman about his wife's recurrent battle with cancer and stated that the next time around he would go for the younger ones who do not get sick. Months after his wife had died, in May 2007, while driving to an appointment together, Bredenberg told Haberman that his grief counselor had told him not to make any changes for one year, that he was not ready for a relationship, and that he just wanted to have sex. He asked Haberman what she thought about his counselor's comments and whether she had any friends who just wanted to have sex and how she knew whether someone was good in bed. After the role-playing training session, Bredenberg again asked Haberman if she had any friends who just wanted to have sex.

Haberman contends Bredenberg's comments were *"sexually hostile"* and reflected his general misogynistic mindset by "implying that women were useful to him simply for sexual gratification, and solicited Haberman's comments on this belief." The undisputed facts do not support Haberman's contention. The record shows Bredenberg told Haberman his grief counselor told him he was not ready for a relationship after his wife's death and of his desire to have sex with someone who was not interested in also having a relationship. Although those two comments were too personal and inappropriate for the workplace, Bredenberg's comments, without more, did not constitute actionable conduct under California law.

Considering " 'the totality of the circumstances' " (*Hughes, supra*, 46 Cal.4th at p. 1044), Haberman's allegations of harassing conduct did not establish conduct sufficiently severe or pervasive as to alter her conditions of employment and create a work environment that qualifies as hostile or abusive to Haberman based on sex. (*Id.* at p. 1043.) The trial court therefore did not err by granting summary judgment as to Haberman's sexual harassment claims as to Reed, Bredenberg, and Cengage.[9]

## III.

### THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT AS TO HABERMAN'S RETALIATION CLAIM.

■ "To establish a prima facie case of retaliation 'a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an

---

[9] In the opening brief, Haberman argues, for the first time, that a triable issue of fact exists as to whether she was sexually harassed based on a theory of quid pro quo. Even assuming Haberman's argument has not been forfeited, her argument fails because Haberman has not presented any evidence showing she was subjected by any defendant to "a demand for sexual favors in return for a job benefit." (*Hughes, supra*, 46 Cal.4th at p. 1048.)

adverse employment action, and (3) there is a causal link between the two.' " (*Mokler, supra,* 157 Cal.App.4th at p. 138.) The trial court granted summary judgment as to Haberman's retaliation claim against Cengage on the ground there was no evidence of a causal link between any adverse action and a complaint by Haberman about defendants' alleged sexual harassment.

Haberman contends a triable issue of material fact exists as to whether she suffered unlawful retaliation for having complained about sexual harassment because the evidence shows (1) she was placed on a PIP; (2) her travel and expense reimbursement request was delayed; (3) she experienced unwarranted delays in the transition between regular payroll and disability benefits; and (4) there were delays in communication between Cengage and its workers' compensation insurance carrier. We address each instance of alleged retaliation, in turn.

First, the undisputed facts show Hogan recommended placing Haberman on a PIP in August 2007 because she had failed to meet her annual sales goals in 2005 and 2006, and because, as of the end of August, she had not reached 43 percent of her 2007 annual sales goal. At Reed's recommendation and with Bredenberg's agreement, Haberman was given one more chance to show significant improvement by reaching 65 percent of her 2007 sales goal by September 30. After she failed to do this (she had only reached 46 percent of her 2007 goal by September 30), she was placed on a PIP on October 10.

Although Haberman contends she complained to Pineda Kinsky in 2005 and 2006 about Bredenberg's alleged sexual harassment, it is undisputed that Pineda Kinsky did not report any such complaint, and thus the individuals responsible for the decision to place Haberman on a PIP were unaware of any such complaint before that decision was made. Two days after she was placed on a PIP, Haberman contacted McDaniel in the human resources department and vaguely complained that she was being harassed, but did not provide any details. Five days after she was placed on a PIP, she complained to Reed that Bredenberg had engaged in inappropriate conduct toward her. Thus, no evidence in the record supports any causal link between Haberman's being placed on a PIP and her having complained about sexual harassment.

Haberman argued she was placed on a PIP in retaliation for her complaints, not for performance reasons, because no one else in the company had been placed on a PIP. She also argued she was the only sales representative placed on a PIP in 2007, and another sales representative who fell short on his sales goals for 2005 and 2007 was never put on a PIP. But, as discussed *ante,* the trial court granted summary judgment because there was no evidence of a causal link between Haberman's complaint and her having been placed on a PIP. In any event, general evidence that one other sales representative who

failed to meet his annual sales goal in 2005 and then again in 2007 was not placed on a PIP, without more, fails to create a triable issue of material fact as to Haberman's claim, particularly when Haberman had failed to meet her annual sales goals in 2005, 2006, *and* 2007.

Second, the undisputed facts show Reed rejected a travel and expense reimbursement request submitted by Haberman, in which $3,000 of the total amount of $4,368.06 in expenses was for personal charges for which Haberman was not entitled to reimbursement. After Haberman removed her personal charges, and provided clarification of her request, Reed approved her request and Haberman was fully reimbursed.

Finally, Haberman contends a triable issue of material fact exists as to her claim for retaliation because she experienced "unwarranted delays in the transition between regular payroll and disability benefits" and there were delays in "Cengage['s] communication with its workers compensation contractor." Haberman, however, has not offered any evidence on this point except for the following statement in the declaration she filed in opposition to defendants' motions: "Following my complaint of sexual harassment to Cengage Human Resources, I have had my short and long term disability payments delayed, my workers compensation case delayed, my employee benefits unjustly curtailed while I was on payroll and not yet receiving disability pay, and my sick leave and vacation banks have been unjustly drawn down." Haberman produced no evidence regarding the circumstances of such delays, who was responsible for such delays, or the length of any such delays. Haberman's general and conclusory statement is insufficient to establish a triable issue of material fact that Cengage itself took any adverse action in retaliation against Haberman for complaining about sexual harassment in the workplace.

The record is devoid of evidence showing a triable issue of material fact on the issue whether Cengage retaliated against Haberman for complaining about sexual harassment. The trial court did not err by granting summary judgment in favor of Cengage on Haberman's retaliation claim.

IV.

THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT AS TO HABERMAN'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

■ The trial court granted summary judgment as to Haberman's claim for intentional infliction of emotional distress against Reed and Bredenberg on

the ground, inter alia, there was no evidence Haberman was subjected to extreme and outrageous conduct. In *Hughes, supra,* 46 Cal.4th at pages 1050–1051, the Supreme Court stated: "A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.] A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' "

In *Hughes*, the Supreme Court stated: "Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.] If properly pled, a claim of sexual harassment can establish 'the outrageous behavior element of a cause of action for intentional infliction of emotional distress.' [Citation.]" (*Hughes, supra,* 46 Cal.4th at p. 1051.) The court further stated, "[w]ith respect to the requirement that a plaintiff show severe emotional distress, this court has set a high bar. 'Severe emotional distress means " 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' [Citation.]" (*Ibid.*)

In *Hughes, supra,* 46 Cal.4th 1035, the court concluded the defendant trustee's "inappropriate comments" (*id.* at p. 1051), which, as discussed *ante,* included the statement, " 'I'll get you on your knees eventually. I'm going to fuck you one way or another' " (*id.* at p. 1040), "fall far short of conduct that is so 'outrageous' that it ' " 'exceed[s] all bounds of that usually tolerated in a civilized community' " ' " (*id.* at p. 1051).

Here, Haberman's claim for intentional infliction of emotional distress is entirely based on the allegations supporting her claims for sexual harassment. As discussed *ante,* those allegations fell far short of establishing a hostile work environment. The trial court did not err by concluding those allegations also fell "far short of conduct that is so 'outrageous' that it ' " 'exceed[s] all bounds of that usually tolerated in a civilized community' " ' " (*Hughes, supra,* 46 Cal.4th at p. 1051).

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

Rylaarsdam, Acting P. J., and Ikola, J., concurred.