[No. G042398. Fourth Dist., Div. Three. Oct. 18, 2011.]

STEPHANIE CROWLEY BRENNAN, Plaintiff and Appellant, v. TOWNSEND & O'LEARY ENTERPRISES, INC., et al., Defendants and Appellants.

---

**COUNSEL**

Pine & Pine, Norman Pine, Beverly Tillett Pine and Janet R. Gusdorff for Plaintiff and Appellant.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller and Lisa R. Wiley for Defendants and Appellants Townsend & O'Leary Enterprises, Inc., and Scott Montgomery.

No appearance for Defendants and Appellants Steve O'Leary and Patricia O'Leary.

---

**OPINION**

**FYBEL, J.—**

## INTRODUCTION

Plaintiff Stephanie Crowley Brennan appeals from a judgment entered in favor of her former employer, Townsend & O'Leary Enterprises, Inc., and a former manager at Townsend & O'Leary Enterprises, Scott Montgomery (collectively referred to as defendants), after the trial court granted defendants' motion for judgment notwithstanding the verdict (JNOV motion). The court granted the JNOV motion on the ground insufficient evidence supported a finding plaintiff had been subjected to severe or pervasive harassment based on her gender.

We affirm. The California Supreme Court has set forth the legal standards to be applied in determining whether a plaintiff has demonstrated severe or pervasive harassment based on gender. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035 [95 Cal.Rptr.3d 636, 209 P.3d 963] (*Hughes*); *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*).) Applying those legal standards to the evidence in the record in the light most favorable to the jury's verdicts, we must conclude insufficient evidence supported a finding plaintiff was subjected to severe or pervasive

harassment based on her gender. The trial court, therefore, did not err by granting defendants' JNOV motion. We cannot reconcile any other result than the one reached by the trial court with California Supreme Court authority. Because we conclude plaintiff's appeal is without merit, we do not reach the issues raised in defendants' cross-appeal.

## CHRONOLOGICAL SUMMARY OF TRIAL EVIDENCE

In the following summary of the evidence, we focus in particular on the nature, frequency, timing, and context of defendants' conduct. (See *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 142 [68 Cal.Rptr.3d 568] (*Mokler*) [setting forth factors that can be considered in evaluating totality of circumstances upon which hostile work environment determination is based].) Consistent with the judgment-notwithstanding-the-verdict standard of review, we recount the facts in the record in the light most favorable to the jury's verdicts, relying heavily on plaintiff's own trial testimony. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138 [76 Cal.Rptr.3d 585].)

In January 1991, plaintiff was hired to work as an assistant media planner for the advertising agency of Townsend & O'Leary Enterprises, Inc. (the agency). In 1995 or 1996, plaintiff became the manager of marketing services. As of the date plaintiff submitted her letter of resignation in January 2005, she served as an account supervisor and vice-president of the agency.

Plaintiff testified that during her employment with the agency, she and the agency's owner, Steve O'Leary, were "very close." She stated he was "more than a friend," as she considered him to be "like a second father to [her] for a long time." Plaintiff was also "close" to Steve O'Leary's wife, Patricia O'Leary, who had been responsible for human resources at the agency since 1984.

Plaintiff testified Steve O'Leary asked about her personal life and relationships "quite often" and "at least a couple of times a month," over an unspecified period of time. She stated that Steve O'Leary would ask "if [she] got any of that" and use a hand gesture, described in the record as consisting of clapping both palms together multiple times, when he talked to her about her sex life. The record does not show when or how often plaintiff and Steve O'Leary discussed her sex life or he made the described hand gesture.

In 1999, the agency hired David Robinson to work in the capacity of senior vice-president media director. Plaintiff testified the agency's office environment began to change after Robinson was hired. Plaintiff did not agree with the agency's decisions to terminate the employment of certain employees.

In May or June 2000, over four years before she resigned, plaintiff helped plan a bachelorette party outside of the office for one of the agency's employees, Dione Disbro. All but one of the partygoers worked for the agency. One of the other planners of the bachelorette party brought to the party a wedding veil that had a plastic penis attached to it for Disbro to wear. The veil was later brought into the office. Plaintiff testified that she was present at a staff meeting during which Steve O'Leary asked Disbro to recount the events of the bachelorette party while wearing the veil. (Plaintiff explained that birthdays, anniversaries, and "personal things that are happening" were discussed during the latter part of staff meetings.) Plaintiff testified Disbro wore the veil for about five minutes and appeared embarrassed. Plaintiff found Steve O'Leary's request offensive because "the original intent of the penis veil was at a bachelorette party."

Plaintiff testified about specific personal conversations she had with Steve O'Leary in the 2000-to-2001 timeframe, years before she resigned. She told Steve O'Leary she was not sure there were "serious men still out there," and had discussed with him her dating relationship with a man who had a young daughter. She also told Steve O'Leary about a sexually transmitted disease she had contracted from a previous boyfriend. Plaintiff talked with Steve O'Leary about finding "a new guy" named Peter. Plaintiff testified those specific conversations had been initiated by Steve O'Leary because he was concerned that plaintiff was having a hard time in her personal life. Plaintiff did not testify that she was offended by any of her conversations with Steve O'Leary regarding her personal life.

In 2000 or 2001, plaintiff attended an offsite Christmas party for the agency, at which a management employee, Michael Todd, dressed as Santa Claus. Todd asked one particular female employee to sit on his lap and asked her about not having a man in her life. Plaintiff said she found Todd's conduct offensive because "that's her personal business," and "[n]obody else at the company needs to know that or see that she feels bad about it or embarrassed by it." Todd invited another female to sit on his lap; she complied and did not appear to be bothered by his request. Todd asked a third employee, Erin Nash, to sit on his lap. Nash complied and Todd asked her about her relationship with another coworker. Plaintiff found Todd's conduct offensive because he was asking Nash about her personal life in front of about 70 people. Each of the women sat on Todd's lap for less than five minutes. Plaintiff was not asked to sit on Todd's lap and stated she was glad she had not been asked to do so.

*2002 to 2003*

Plaintiff attended another offsite Christmas party in either 2002 or 2003, at which Steve O'Leary wore a red-and-white Santa hat which had the word "bitch" across the brow. Plaintiff found Steve O'Leary's hat offensive because he was the agency's owner and chief executive officer.

Plaintiff did not complain about the conduct that occurred at either Christmas party.

Defendant Scott Montgomery was hired by the agency in January 2002 as executive creative director. Montgomery was never plaintiff's supervisor. There was no evidence plaintiff observed any incidents of sexual harassment at the agency in between the two Christmas parties discussed *ante*, or between the more recent Christmas party and the August 2004 e-mail.

*August 2004*

On August 19, 2004, in response to news that employee Scott Berger was leaving the agency, Montgomery sent an e-mail to Robinson, which was inadvertently forwarded to Berger (the August 2004 e-mail). In the August 2004 e-mail, Montgomery stated in relevant part: "Three down, one big-titted, mindless one to go." Berger forwarded the August 2004 e-mail to plaintiff. She testified she believed the "three down" referred to Berger, a former agency employee named Amy Shepeck, and plaintiff's supervisor, John Most. Plaintiff accurately understood that the statement "big-titted, mindless one" referred to her; she found the August 2004 e-mail demeaning and otherwise offensive. Plaintiff brought the August 2004 e-mail to Most's attention. Most told plaintiff he would take care of it.

*Post-August 2004*

Plaintiff testified that after receipt of the August 2004 e-mail, she started speaking to past and present employees of the agency to find out whether there were other examples of sexual harassment at the agency. She learned from a coworker that in September 2003, Montgomery had sent an e-mail to that coworker, in which he stated that one of the agency's female clients was "a demanding, unconstructive, counter-productive, mindless, shitty-ass bitch." The e-mail had not been sent to plaintiff. Plaintiff also learned that Montgomery had called the same client a "cunt," and made inappropriate comments to female coworkers, although plaintiff had never heard those comments herself.

Shortly after receiving the August 2004 e-mail, plaintiff went on a previously scheduled vacation to Hawaii, using a ticket that had been paid for by

Steve O'Leary. Plaintiff met with Most and Steve O'Leary after she returned to work.[1] Steve O'Leary apologized to plaintiff for what had happened and showed her a letter of reprimand Montgomery had signed which warned Montgomery against violating the agency's sexual harassment policy. Steve O'Leary told plaintiff that Montgomery wanted to apologize to her; however, plaintiff told Steve O'Leary she did not want Montgomery to apologize to her. After receipt of the August 2004 e-mail, plaintiff did not have any interaction with Montgomery.

A week after she first met with Steve O'Leary about the August 2004 e-mail, plaintiff again met with him. She told Steve O'Leary that she was not sure the agency was an environment she could or wanted to "grow in." She informed Steve O'Leary that she had learned of other examples of sexual harassment at the agency, but said she was too upset to talk about them and refused to provide him with any examples. He asked her to stay at the agency and help fix the environment and bring the culture back to what it once was. Instead of agreeing to stay, plaintiff discussed with Steve O'Leary an "exit strategy" that she called a constructive discharge, which she assumed would include a compensation package. At trial, plaintiff was asked: "So you wanted a compensation package in order to leave [the agency] because of the e-mail that you got on August 19th, 2004; is that correct?" Plaintiff responded: "I wanted a constructive discharge in result of the e-mail that I got on August 19th, 2004. Like a layoff situation, yes."

During a third meeting a few days later in mid-September 2004, Steve O'Leary told plaintiff that he wanted her to stay at the agency and help fix the work environment. He told her that he took complaints of sexual harassment very seriously and asked for the names of people to whom she had spoken. Plaintiff told Steve O'Leary she was not sure they would be willing to speak to him. Plaintiff had expected that Steve O'Leary "was going to come to the table . . . with a . . . package" for her.

On October 14, 2004, plaintiff and Steve O'Leary met again. Plaintiff told him the other complainants were not willing to speak with him. She also told him that she had decided to "move on" with her attorney and gave Steve O'Leary a letter from her attorney.

---

[1] Plaintiff testified that while she was on vacation, e-mail-shredding software was installed on the agency's computer systems, which she considered a retaliatory act. In her opening brief, plaintiff does not argue the installation of the software constituted an act of retaliatory harassment, but only that it reflects the agency was "intent upon covering-up sexual harassment [rather] than eradicating it." After she returned from vacation, she discovered the August 2004 e-mail, along with other e-mails, was erased from her computer. There is no evidence the software was installed only on plaintiff's computer. Furthermore, plaintiff testified that she was able to retrieve a copy of the August 2004 e-mail from her computer when she resigned in January 2005.

In November 2004, the agency brought in someone from outside the agency to investigate sexual harassment in the agency's workplace. Plaintiff refused to speak with him.

On January 4, 2005, plaintiff gave one week's notice that she would no longer be working for the agency. A week or two after she left the agency, she started working for Most, who had resigned from the agency in September 2004.

At trial, plaintiff was asked: "So besides the August 19th of 2004 e-mail there were no other instances where you were personally subjected to sexual harassment in your 14 years of employment with [the agency]; is that correct?" Plaintiff answered: "Not that I know of that I was subjected to directly." Plaintiff was also asked: "From the date of the e-mail, August 19th of 2004, until the date of your resignation, January 4th, 2005, you never personally experienced any sexual harassment, did you?" Plaintiff responded: "Personally, no."

Plaintiff claimed that after she got her attorney involved, she felt people were avoiding her at work. She was getting "kind of pulled back" from attending certain meetings; she testified this began, however, before the August 2004 e-mail. The agency's vice-president at the time, Jim Harrington, stopped attending her account meetings after her attorney got involved. Although she suggested the agency conduct sexual harassment training, it did not happen. Plaintiff argues Montgomery's reprimand was an insufficient consequence for his conduct. She testified she considered unfair and offensive the agency's failure to provide her a report from the agency's sexual harassment investigation. She felt further retaliated against when Patricia O'Leary asked plaintiff during her exit interview, "why are you doing this to us?"

## PROCEDURAL BACKGROUND

Plaintiff's operative complaint asserted claims for violations of Labor Code section 1102.5, subdivisions (a) and (b) and wrongful constructive termination in violation of public policy against the agency, Steve O'Leary, and Patricia O'Leary; sexual harassment and negligent infliction of emotional distress against the agency, Steve O'Leary, Patricia O'Leary, and Montgomery; and intentional infliction of emotional distress and defamation against the agency, Steve O'Leary, and Montgomery. No cause of action for retaliation was included in the operative complaint.

Only two of the claims contained in the operative complaint—wrongful termination in violation of public policy and sexual harassment—were tried

before a jury. At the conclusion of plaintiff's case-in-chief, the trial court granted a defense motion for nonsuit as to the wrongful constructive termination claim. The court also granted nonsuit on the sexual harassment claim as to Steve O'Leary and Patricia O'Leary only.

The jury returned special verdicts in favor of plaintiff and against defendants on the sexual harassment claim, expressly finding plaintiff was subjected to severe or pervasive harassment because she was a woman. Judgment was entered awarding plaintiff $200,000 against the agency and $50,000 against Montgomery.

Defendants filed the JNOV motion and a motion for a new trial. The trial court granted the JNOV motion and judgment was entered in defendants' favor. Plaintiff filed a notice of appeal. Defendants filed a notice of cross-appeal.[2]

## STANDARD OF REVIEW

"The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. [Citation.] 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo. [Citation.]" (*Wolf v. Walt Disney Pictures & Television, supra*, 162 Cal.App.4th at p. 1138.)

## DISCUSSION

Plaintiff's sole contention on appeal is that the trial court erred by granting the JNOV motion because substantial evidence supported the jury's verdicts finding in her favor as to the sexual harassment claim. Citing *Lyle, supra*, 38

---

[2] In their cross-appellants' opening brief, defendants argue that the JNOV motion was properly granted, but in the event this court concludes otherwise, "the matter should have been dismissed *ab initio* because the trial court lacked jurisdiction to hear it, or summary judgment or nonsuit should have been granted. In the alternative, the jury verdict must be reversed, because there was no substantial evidence to support it." For the reasons we explain *post*, the JNOV motion was properly granted. We therefore do not reach the issues raised in the cross-appeal.

Cal.4th 264, the trial court at the hearing on the JNOV motion stated that insufficient evidence supported the jury's finding plaintiff was subjected to severe or pervasive sexual harassment in the workplace as a matter of law. For the reasons we will explain in detail, the jury's verdicts were not supported by substantial evidence because, as a matter of law, insufficient evidence shows plaintiff was subjected to severe or pervasive sexual harassment as defined by California Supreme Court precedent.

## I.

### SEXUAL HARASSMENT LAW

■ The California Supreme Court restated the framework of sexual harassment law in California, as follows: "Like federal law, California law prohibits sexual harassment in the workplace. Originally enacted in 1980, Government Code section 12940 is part of the FEHA [(the California Fair Employment and Housing Act)]. [Citation.] It defines 'an unlawful employment practice' as an employer's refusal to hire, employ, or select for a training program leading to employment, any person because of that person's 'race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical·condition, marital status, *sex*, age, or sexual orientation.' [Citation.] Since 1985, the FEHA has prohibited sexual harassment of an employee. [Citation.] [¶] With respect to sexual harassment in the workplace [citation], the prohibited conduct ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is 'hostile or abusive to employees because of their sex.' [Citation.] Thus, similar to the federal law's Title VII [(tit. VII of the Civil Rights Act of 1964)], California's FEHA 'recognize[s] two theories of liability for sexual harassment claims . . . ". . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." ' [Citations.]" (*Hughes, supra*, 46 Cal.4th at pp. 1042–1043.)

■ The Supreme Court in *Hughes, supra*, 46 Cal.4th at pages 1043–1044, further stated: "In construing California's FEHA, this court has held that the hostile work environment form of sexual harassment is actionable only when the harassing behavior is *pervasive* or *severe*. [Citation.] This limitation mirrors the federal courts' interpretation of Title VII. [Citation.] To prevail on a hostile work environment claim under California's FEHA, an employee must show that the harassing conduct was 'severe enough or sufficiently pervasive to alter the conditions of employment and create a work

environment that qualifies as hostile or abusive to employees because of their sex.' [Citations.] There is no recovery 'for harassment that is occasional, isolated, sporadic, or trivial.' [Citation.] [¶] Courts that have construed federal and California employment discrimination laws have held that an employee seeking to prove sexual harassment based on no more than a few isolated incidents of harassing conduct must show that the conduct was 'severe in the extreme.' [Citations.] A single harassing incident involving 'physical violence or the threat thereof' may qualify as being severe in the extreme. [Citations.] [¶] Under California's FEHA, as under the federal law's Title VII, the existence of a hostile work environment depends upon 'the totality of the circumstances.' [Citation.]"[3]

■ In *Lyle, supra,* 38 Cal.4th at pages 284–285, the California Supreme Court stated: "[S]exual conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff. [Citations.] A hostile work environment sexual harassment claim by a plaintiff who was not personally subjected to offensive remarks and touchings requires 'an even higher showing' than a claim by one who had been sexually harassed without suffering tangible job detriment: such a plaintiff *must* 'establish that the sexually harassing conduct permeated [her] direct work environment.' [Citation.] [¶] *To meet this burden, the plaintiff generally must show that the harassment directed at others was in her immediate work environment, and that she personally witnessed it.* [Citation.] The reason for this is obvious: if the plaintiff does not witness the incidents involving others, 'those incidents cannot affect . . . her perception of the hostility of the work environment.' [Citation.]" (Italics added.)

■ In evaluating the totality of the circumstances to determine the existence of a hostile work environment, the following factors can be considered: " '(1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred. [Citation.] [¶] In determining what constitutes "sufficiently pervasive" harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a *concerted pattern of harassment of a repeated, routine or a generalized nature.* [Citation.] . . .' [Citation.]" (*Mokler, supra,* 157 Cal.App.4th at p. 142, italics added, quoting *Fisher v. San Pedro Peninsula*

---

[3] " '[T]o be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive . . . ." ' Therefore, 'a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail . . . if a reasonable person . . . , considering all the circumstances, would not share the same perception.' [Citation.]" (*Hughes, supra,* 46 Cal.4th at p. 1044.)

*Hospital* (1989) 214 Cal.App.3d 590, 610 [262 Cal.Rptr. 842]; see *Lyle, supra,* 38 Cal.4th at p. 283 [" ' "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' "].)

## A.

### *Lyle, supra,* 38 Cal.4th 264

In *Lyle, supra,* 38 Cal.4th at pages 294–295, the California Supreme Court concluded as a matter of law on summary judgment that the plaintiff had not experienced severe or pervasive sexual harassment in her workplace. The plaintiff in *Lyle* was a comedy writers' assistant who worked on the production of the television show *Friends.* (*Id.* at p. 271.) After she was fired because of problems with her typing and transcription, she sued three of the male comedy writers and others, based on certain defendants' use of "sexually coarse and vulgar language and conduct, including the recounting of their own sexual experiences." (*Id.* at pp. 271–272.) Some of the defendants made offensive comments about certain women working on the production of *Friends,* which included statements about what they would like to do sexually to the different female cast members of the show, jokes that one defendant had missed a sexual opportunity with one of the actresses, and "demeaning comments about another of the actresses, asking whether she was competent in sexually servicing her boyfriend and remarking she probably had 'dried twigs' or 'dried branches' in her vagina." (*Id.* at p. 288.)

The Supreme Court stated in *Lyle, supra,* 38 Cal.4th at page 289: "Because the derogatory comments did not involve plaintiff, she was obligated to set forth specific facts from which a reasonable trier of fact could find the conduct 'permeated' her direct workplace environment and was ' "pervasive and destructive." ' " The court further stated the plaintiff "acknowledged the writers made references to the one actress's fertility and the 'dried branches in her vagina' on only one occasion. Plaintiff did not, however, offer specific facts regarding how often or on how many occasions the writers engaged in the graphic sexual jokes and talk about the other actress. . . . Without more, a reasonable trier of fact could not conclude that these reported comments concerning the two actresses 'permeated' plaintiff's direct work environment, or that they were ' "pervasive and destructive of [that] environment," ' so as to allow recovery despite the fact plaintiff was not personally subjected to offensive remarks or touchings and did not suffer a tangible job detriment." (*Id.* at pp. 289–290.)

The plaintiff also offered evidence that certain defendants referred "to women who displeased them or made them mad as 'cunts' and 'bitches.' " (*Lyle, supra*, 38 Cal.4th at p. 290.) The Supreme Court noted the plaintiff did not assert that the defendants ever referred to her by those terms either to her face or to others and gave no indication whether the writers used gender-related epithets with reference to men in comparable situations. (*Ibid.*) The court held that "[c]onsidering the totality of the circumstances, whether we view the epithet evidence by itself, or in conjunction with the evidence of the actress-related comments, we are unable to conclude a reasonable trier of fact could, on the meager facts shown, find the conduct of the three male writers was sufficiently severe or pervasive to create a hostile work environment." (*Id.* at p. 291.)

The court further stated, "summary judgment was proper here because, as demonstrated above, none of the offensive conduct complained of meets both the 'because of sex' and 'severe or pervasive' requirements for establishing a hostile work environment sexual harassment claim. [Citation.] That is, while the record conceivably reflects a triable issue of fact as to whether some of defendants' offensive comments were directed at women because of their sex and hence unnecessary to the work (i.e., the reported gender-related epithets and the comments involving the actresses), the facts plaintiff offered simply are insufficient to establish that any such conduct was severe enough or sufficiently pervasive to be actionable. Moreover, assuming arguendo the incidents taking place in the hallways somehow could be deemed unnecessary to the work generated inside the writers' room, there is no indication these other incidents involved or were aimed at plaintiff or any other female employee, or that they appeared materially different from the type of sexual joking and discussions occurring in the writers' room that actually led to material for scripts." (*Lyle, supra*, 38 Cal.4th at p. 292.) The Supreme Court stated: "When we apply the legal principles governing sexual harassment claims, and give plaintiff the benefit of the rules governing review of summary judgment orders, we conclude defendants have shown that plaintiff has not established, and cannot reasonably expect to establish, a prima facie case of hostile workplace environment sexual harassment." (*Id.* at pp. 294–295.)

B.

*Hughes, supra,* 46 Cal.4th 1035

In *Hughes, supra*, 46 Cal.4th at page 1050, the California Supreme Court affirmed summary judgment in favor of the defendant on a claim for sexual harassment on the ground the facts were insufficient as a matter of law to establish severe or pervasive harassment based on gender. In *Hughes*, the

defendant was one of the trustees of the $350 million trust provided by the plaintiff's late ex-husband for their son. (*Id.* at p. 1039.) On her son's behalf, the plaintiff requested that the trust provide $160,000 for a two-month rental of a beach house. (*Ibid.*) The trustees unanimously rejected the request but agreed to provide $80,000 for a one-month rental. (*Id.* at pp. 1039–1040.) Two weeks later, the defendant contacted the plaintiff to invite her son to attend a private showing at a museum. (*Id.* at p. 1040.) During that conversation, the defendant called the plaintiff " 'sweetie' " and " 'honey,' " and said he thought of her " 'in a special way, if you know what I mean.' " (*Ibid.*)

After the plaintiff asked the defendant why the trustees had only authorized a one-month rental for the beach house, the defendant stated that he could be persuaded to cast his vote for an additional month if the plaintiff would be " 'nice' " to him. (*Hughes, supra,* 46 Cal.4th at p. 1040.) The defendant told the plaintiff: " 'You know everyone always had a thing for you. You are one of the most beautiful, unattainable women in the world. Here's my home telephone number and call me when you're ready to give me what I want.' " (*Ibid.*) The plaintiff said the defendant's comments were " 'crazy,' " to which the defendant responded, " '[h]ow crazy do you want to get?' " (*Ibid.*)

That night, the plaintiff took her son to the museum where the defendant told her, " 'I'll get you on your knees eventually. I'm going to fuck you one way or another.' " (*Hughes, supra,* 46 Cal.4th at p. 1040.) The plaintiff sued the defendant for sexual harassment under Civil Code section 51.9 which provides for sexual harassment liability in the context of relationships between providers of professional services and their clients. (*Hughes, supra,* at pp. 1040, 1044–1046.) The trial court granted the defendant's motion for summary judgment and the appellate court affirmed. (*Id.* at p. 1040.)

On review, the California Supreme Court applied the same legal principles of sexual harassment law in the workplace to the plaintiff's claim for sexual harassment under Civil Code section 51.9, stating: "[T]he Legislature intended to conform Civil Code section 51.9 to the California and federal laws pertaining to sexual harassment in the workplace." (*Hughes, supra,* 46 Cal.4th at p. 1048.) Applying those principles, the Supreme Court concluded, "[h]ere, defendant's sexually harassing conduct, as plaintiff has described it, was not 'pervasive' within the meaning of Civil Code section 51.9—that is, it was not so egregious as to alter the conditions of the underlying professional relationship. [Citations.] To be *pervasive,* the sexually harassing conduct must consist of 'more than a few isolated incidents.' [Citation.] That standard has not been met here. As we have explained, the alleged sexual harassment consisted only of comments defendant made to plaintiff during a single telephone conversation and a brief statement defendant made to plaintiff in person later that day during a social event at a museum." (*Ibid.*)

The Supreme Court also concluded the defendant's conduct was not severe, stating: "[E]mployment law acknowledges that an isolated incident of harassing conduct may qualify as 'severe' when it consists of 'a *physical* assault or the threat thereof.' [Citations.] . . . Although vulgar and highly offensive, [the defendant's remark at the museum], which was made in the presence of other people attending a private showing at a museum, would not plausibly be construed by a reasonable trier of fact as a threat to commit a sexual assault on plaintiff. [Citation.] Most reasonably construed, defendant's comment was a threat, not of physical violence, but of financial retaliation: that he would use his power as a trustee to thwart plaintiff's requests to allocate funds from the trust established for her son Alex. But such a threat will not support a claim under [Civil Code] section 51.9 for the hostile environment form of sexual harassment, because it does not constitute 'severe' harassing conduct." (*Hughes, supra,* 46 Cal.4th at p. 1049.)

## C.

### *Mokler, supra,* 157 Cal.App.4th 121

In *Mokler, supra,* 157 Cal.App.4th at pages 126–127, a panel of this court concluded that a county employee's sexual harassment claim against a county supervisor failed because the employee's allegations of misconduct did not establish a hostile work environment as a matter of law. The appellate court stated: "Norby's harassment of Mokler occurred on three occasions over a five-week period, and involved no physical threats. The first occurred on January 29, 2003, at an offsite budget meeting. During the lunch break, Mokler approached Norby and introduced herself. Norby asked about her marital status and called her an 'aging nun' when he learned she was not married. [¶] The second occurred on February 5, 2003, at a hotel celebration. There, Norby took Mokler by the arm, pulled her to his body, and asked, 'Did you come here to lobby me?' When she answered no, Norby . . . responded: 'Why not? These women are lobbying me.' He told Mokler she had a nice suit and nice legs, and looked up and down at her. [¶] The third occurred on March 3, 2003, at Norby's office. Norby told Mokler she looked nice and put his arm around her. He then asked Mokler where she lived, demanding to know her exact address. Norby again put his arm around Mokler and, as he did so, his arm rubbed against her breast. When Mokler tried discussing the services provided by [her department], Norby interrupted, stating: 'Why . . . do you have to do something special for Mexicans?' " (*Id.* at p. 144.)

The appellate court in *Mokler, supra,* 157 Cal.App.4th at pages 145–146, stated: "Following established precedent, we conclude these acts of harassment fall short of establishing 'a pattern of continuous, pervasive harassment' [citation], necessary to show a hostile working environment under FEHA.

Norby did not supervise Mokler or work in the same building with her. The first incident involved no touching or sexual remarks; rather, Norby uttered an isolated but boorish comment on Mokler's marital status. The second incident did not occur at work, and involved a minor suggestive remark and nonsexual touching. The third incident involved touching when Norby placed his arm around Mokler and rubbed his arm against her breast in the process. The touching, however, was brief and did not constitute an extreme act of harassment. Norby's request for Mokler's home address was brazen, but this conduct falls short of what the law requires to establish a hostile work environment. Norby's derogatory statement regarding Mexicans was unmistakably foul and offensive, but not sexual. [¶] Taken as a whole, the foregoing acts demonstrate rude, inappropriate, and offensive behavior. To be actionable, however, a workplace must be ' "permeated with 'discriminatory intimidation, ridicule and insult,' [citation] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' [Citation.] The acts Mokler has alleged here are similar in scope to those found insufficient to constitute a hostile work environment in other cases. (See, e.g., *Quinn v. Green Tree Credit Corp.* (2d Cir. 1998) 159 F.3d 759, 768 [harasser's statement that plaintiff had been voted the ' "sleekest ass" ' in the office and single deliberate act of touching plaintiff's breasts with papers he was holding in his hand held insufficient]; *Weiss v. Coca-Cola Bottling Co. of Chicago* (7th Cir. 1993) 990 F.2d 333, 337 [insufficient where supervisor told plaintiff how beautiful she was, repeatedly asked her out, tried to kiss her on three separate occasions, put ' "I love you" ' signs on her work area, and touched her shoulder at least six times]; *Chamberlin v. 101 Realty, Inc.* (1st Cir. 1990) 915 F.2d 777, 783 [five sexually motivated advances on plaintiff over a four- or five-week period held insufficient for hostile work environment].) [¶] While we do not condone Norby's improper behavior, Mokler failed to present sufficient evidence of acts ' " 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.' " ' "

II.

INSUFFICIENT EVIDENCE SUPPORTED THE JURY'S FINDING PLAINTIFF
WAS SUBJECTED TO SEVERE OR PERVASIVE HARASSMENT BASED ON
HER GENDER.

■ We have reviewed the trial evidence in light of the legal principles and holdings set forth in *Lyle, supra,* 38 Cal.4th 264, *Hughes, supra,* 46 Cal.4th 1035, and *Mokler, supra,* 157 Cal.App.4th 121. For the reasons we will explain, insufficient evidence supported the jury's finding plaintiff was subjected to severe or pervasive harassment based on her gender.

## A.

### *Insufficient Evidence Supported a Finding of Severe Sexual Harassment.*

We begin our analysis by observing the trial evidence did not support a finding plaintiff was ever subjected to severe sexual harassment. Neither the August 2004 e-mail nor any evidence at trial showed plaintiff was ever assaulted, subjected to "unwelcome physical contact," threatened, propositioned, or subjected to explicit language directed at her or at anyone else in her presence. (*Lyle, supra*, 38 Cal.4th at p. 289; see *Hughes, supra*, 46 Cal.4th at p. 1049 ["isolated incident of harassing conduct may qualify as 'severe' when it consists of 'a *physical* assault or the threat thereof' "].) Plaintiff was also never subjected to "verbal abuse or harassment." (*Lyle, supra*, at p. 289.) In light of the Supreme Court's holding in *Hughes, supra*, 46 Cal.4th 1035, that the plaintiff there did not suffer severe sexual harassment, there can be no colorable argument that plaintiff here suffered severe sexual harassment.

We therefore turn to consider whether the trial evidence supported a finding plaintiff was subjected to pervasive sexual harassment.

## B.

### *Insufficient Evidence Supported a Finding of Pervasive Sexual Harassment.*

We review the trial evidence as to the nature, timing, frequency, and context of each of the incidents plaintiff claims supported a finding of pervasive sexual harassment, to determine whether substantial evidence supported the jury's verdicts.

## 1.

### *The August 2004 e-mail*

At trial, plaintiff testified that the August 2004 e-mail was the only incident of harassment based on her gender directed at her. Although the August 2004 e-mail, which Montgomery admitted referred to plaintiff as a "big-titted, mindless one" (although it did not mention her by name), was rude, insulting, and unprofessional, the record shows it was an isolated event as there was no evidence Montgomery (or any employee of the agency) made any other derogatory remarks about plaintiff, sex based, or otherwise, in any other context. Turning to the August 2004 e-mail, the evidence showed it was not

intended to be shared publicly. Instead, it was indisputably intended by Montgomery to have been only sent to one person, Robinson. Plaintiff saw the August 2004 e-mail only after Montgomery inadvertently forwarded it to Berger who in turn forwarded it to plaintiff. Plaintiff was a vice-president of the agency at the time of the August 2004 e-mail, and Montgomery was never her supervisor.

2.

*Evidence plaintiff witnessed only three incidents of gender-based conduct involving coworkers over the span of several years*

In her opening brief, plaintiff argues that in addition to the August 2004 e-mail, the jury's verdicts are supported by evidence that plaintiff witnessed the following three incidents of sexual conduct in the workplace over a three-year period: (1) Disbro wearing the veil with the plastic penis attached to it for five minutes during a staff meeting at Steve O'Leary's request in May or June 2000;[4] (2) Todd, dressed as Santa Claus, asking three female employees to sit on his lap for about five minutes while he asked personal questions at the agency's offsite Christmas party in 2000 or 2001; and (3) Steve O'Leary wearing a Santa hat with the word "bitch" across the brow at the agency's offsite Christmas party in either 2002 or 2003.[5]

---

[4] We observe that some of the examples of sexual harassment asserted by plaintiff in this case are likely statutorily barred from supporting her claim of pervasive sexual harassment. The record shows plaintiff did not file a precomplaint questionnaire with California's Department of Fair Employment and Housing until May 2005 and did not file an administrative charge of discrimination until March 2007. (See *Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 323 & fn. 2 [121 Cal.Rptr.3d 330] [before filing a lawsuit for harassment or retaliation, a party must file an administrative complaint with the Department of Fair Employment and Housing within one year from the time of the conduct constituting sexual harassment].) Although the continuing violation doctrine " 'allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period,' " the doctrine applies if the unlawful actions are " '(1) sufficiently similar in kind . . . ; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence.' " (*Id.* at pp. 325–326.) On this record, we cannot see how the incidents of wrongful conduct relied upon by plaintiff in this action can be considered as continuing with reasonable frequency when the incidents are spaced apart no less than six months and sometimes more than a year. An employee should not be permitted to bide his or her time and then, if the harassment resumes after such a long period of time, seek to recover for conduct that occurred throughout the history of the working relationship. Nevertheless, for purposes of our analysis, we assume none of the examples of purported sexual harassment offered by plaintiff is statutorily barred.

[5] Plaintiff produced evidence that she witnessed a fourth incident in which Steve O'Leary suggested to a male employee that the employee sleep with a female client to "help make the relationship better." No evidence, however, shows when Steve O'Leary made this statement.

The first incident, involving Disbro wearing the veil for five minutes at a staff meeting, occurred *over* four years before the August 2004 e-mail. Disbro wore the same veil at the bachelorette party planned by plaintiff. The second and third incidents that occurred at offsite Christmas parties did not occur in plaintiff's immediate work environment. (See *Lyle, supra*, 38 Cal.4th at p. 285 ["plaintiff generally must show that the harassment directed at others was in her immediate work environment . . ."].) Furthermore, the third incident, consisting of Steve O'Leary wearing the Santa hat displaying the word "bitch" at the 2002 or 2003 Christmas party, alone, without more, fails to reflect an action demonstrating harassment on the basis of gender. (See *id.* at p. 290 [remanding to Court of Appeal to affirm summary judgment in favor of the defendants, Supreme Court noted that the record "gave no indication whether the [defendants] used gender-related epithets with reference to men in comparable situations" and further noted the term "bitch" is "not a term that was *necessarily* misogynistic" (italics added)].)[6]

To show pervasiveness of sexual harassment, a plaintiff must show "a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Lyle, supra*, 38 Cal.4th at p. 283.) Montgomery wrote and sent the August 2004 e-mail. A different person, Todd, dressed as Santa Claus at the 2000 or 2001 Christmas party asked three female employees to sit on his lap. And yet a different person, Steve O'Leary, asked Disbro to wear the veil at the staff meeting in May or June 2000 and wore the Santa hat at the 2002 or 2003 Christmas party. Those four incidents occurred over the course of a four-year period with a frequency of six months to years in between incidents. We cannot conclude that those incidents constitute a " 'pattern of continuous, pervasive harassment' " (*Mokler, supra*, 157 Cal.App.4th at p. 145) when no memorable incidents of harassment occurred over the course of an entire year. In any event, sporadic, isolated events do not show pervasiveness. Accordingly, such evidence simply does not show a concerted pattern of harassment of a repeated, routine, or generalized nature.

3.

*Evidence regarding plaintiff's conversations with Steve*
*O'Leary regarding her personal life*

In her opening brief, plaintiff argues that the trial evidence showed Steve O'Leary asked her quite often and at least a couple of times a month

---

(The male employee started working for the agency in 1997.) In any event, nothing suggests the comment constitutes harassment based on plaintiff's gender.

[6] John Most testified: "I don't think [Montgomery] treated females in the agency better than he treated males. He was pretty brutal on anybody."

"intrusive and offensive questions about her relationships and whether she was having sex." She asserts the trial evidence showed she had to endure Steve O'Leary's "physical hand gestures while he asked her on 'multiple' occasions 'if [she] got any of that.' " The record shows that during an unspecified period of time, Steve O'Leary asked about plaintiff's personal life and relationships "quite often" and "at least a couple of times a month." Plaintiff did not testify about how often or when Steve O'Leary asked about her sex life or whether she was having sex. (The question posed was about her "sex life," but plaintiff answered in terms of her "personal relationships.") No evidence shows when or how often Steve O'Leary used the physical hand gesture, which plaintiff described as Steve O'Leary clapping his hands together multiple times, while asking if she "got any of that."

At trial, plaintiff testified as follows:

"Q. By [plaintiff's counsel]: How often did defendant Steve O'Leary ask you about your sex life?

"[Defendants' counsel]: Objection. [¶] It lacks foundation. [¶] Irrelevant.

"The Court: Overruled.

"[Plaintiff]: He would ask me about my personal life and relationships quite often. [¶] I'd say at least a couple of times a month.

"Q. By [plaintiff's counsel]: Is there any physical gesture that Mr. O'Leary would use when he would talk to you about your sex life?

"[Defendants' counsel]: Objection. [¶] Irrelevant. [¶] Argumentative.

"Q. By [plaintiff's counsel]: Yes, or no?

"A. Yes.

"[Defendants' counsel]: Objection. [¶] Argumentative. [¶] Overbroad.

"The Court: Overruled.

"Q. By [plaintiff's counsel]: Okay. Could you, please, show the jury what defendant Steve O'Leary would do physically when he talked to you about your sex life?

"A. I recall, I recall him asking me if I got any of that?

"Q. If you had got any of that, clapping both of your palms together—

"A. Uh-huh.

"Q.—multiple times?

"A. Yes."

Plaintiff also testified that at least some of the conversations about her personal life were welcomed by her. She recalled conversations in 2000 and 2001, in which she shared intimate details about her private life with Steve O'Leary, including whom she was dating and that she had contracted a disease from a former boyfriend. She testified that although Steve O'Leary initiated the conversations in which she shared that private information, he did so out of concern for her because she had been having a hard time in her personal life. The vagueness of the evidence about the frequency of and circumstances surrounding each of plaintiff's conversations with Steve O'Leary, regarding her personal life, does "not aid in showing" those conversations "contributed to an objectively abusive or hostile work environment." (*Lyle, supra*, 38 Cal.4th at p. 291.)

Conspicuously absent from the record is evidence plaintiff found any of those inquiries, or any gestures made during those discussions, offensive. The need for evidence of the unwelcomeness of any or all of Steve O'Leary's inquiries is underscored by plaintiff's own testimony that she used profanity at work and she sent e-mails containing sexual material to coworkers from her computer at work, including two e-mails she wrote, which were unsolicited by Steve O'Leary, Montgomery, or any other person in management at the agency. (We see no need to quote them here.) The trial evidence, therefore, does not support a finding that plaintiff's conversations with Steve O'Leary, regarding her personal life, constituted acts of sexual harassment.

4.

*Evidence of plaintiff's investigation to discover further instances of sexual harassment after she received the August 2004 e-mail*

Plaintiff testified that after receiving the August 2004 e-mail, she started speaking to the agency's current and former employees "to see if there were other examples" of sexual harassment. After making inquiries, she learned that a year earlier, Montgomery had called one of the agency's female clients a

"cunt"[7] and a "mindless, shitty-ass bitch." Plaintiff learned that Montgomery had also made inappropriate comments to female coworkers, including referring to one as "honey" and asking her to get him a cup of coffee. She also learned that a former female employee of the agency had complained about a client's harassing comments made in 1997 or 1998 and she was told to "just deal with it" in front of Steve O'Leary.[8]

As discussed *ante*, the Supreme Court in *Lyle, supra*, 38 Cal.4th at page 285, stated that to prove a hostile work environment sexual harassment claim, a plaintiff "*must* 'establish that the sexually harassing conduct permeated [her] direct work environment' " and "[t]o meet this burden, the plaintiff generally *must show* that the harassment directed at others was in her immediate work environment, and that she personally witnessed it." (Italics added.) The Supreme Court explained that "[t]he reason for this is obvious: if the plaintiff does not witness the incidents involving others, 'those incidents cannot affect . . . her perception of the hostility of the work environment.' " (*Ibid.*)

Plaintiff points out the Supreme Court qualified the general rule articulated in *Lyle, supra*, 38 Cal.4th at page 285, by using the word "generally." Plaintiff argues that as long as she learned of other incidents of sexual harassment directed at others while she was still employed, such incidents of sexual harassment can prove she suffered a hostile work environment. The court in *Lyle, supra*, 38 Cal.4th at page 285, footnote 7, noted the appellate court in *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519 [76 Cal.Rptr.2d 547] held that " 'a reasonable person may be affected by knowledge that other workers are being sexually harassed in the workplace, *even if he or she does not personally witness that conduct*.' " The Supreme Court in *Lyle* stated it "need not address that conclusion" because the plaintiff in *Lyle* had personal knowledge of the incidents of sexual harassment at issue. (*Lyle, supra*, at p. 285, fn. 7.) We construe the *Lyle* court's statement that a plaintiff *must* generally show that incidents of sexual harassment not directed at him

---

[7] In her opening brief, plaintiff cites evidence that Montgomery was heard calling the same client a "cunt" a second time at the end of 2004. There is no evidence in the record when plaintiff learned of this incident or whether she was still employed at the time she learned of this incident.

[8] Plaintiff argues the agency acted inappropriately in producing a video by using a female employee to play the role of a nurse wearing a tight, short outfit instead of hiring an actress to do so. In her opening brief, plaintiff clarifies that she does not contend the subject matter of the video was inappropriate for an advertising agency to produce, just the casting of a female employee. The record does not show when plaintiff learned of the female employee's role in the video, if at all, during her employment. Furthermore, as discussed *post*, such evidence does not support plaintiff's claim for sexual harassment as the record does not show the video shoot featuring the female employee occurred in plaintiff's presence or in her immediate work environment.

or her had occurred in his or her presence and immediate work environment, as the general rule, which, of course, might have its exceptions.

In *Beyda v. City of Los Angeles, supra,* 65 Cal.App.4th at page 516, the appellate court did not conduct a substantial evidence review of a sexual harassment claim. Instead, the appellate court analyzed whether the trial court abused its discretion by excluding evidence of sexual harassment that was not directed at the plaintiff and occurred outside of the plaintiff's presence at the trial on the plaintiff's sexual harassment claim. (*Ibid.*) The appellate court explained, "personal observation is not the only way that a person can perceive, and be affected by, harassing conduct in the workplace. One can also be affected by knowledge of that harassment." (*Id.* at p. 521.) Thus, in *Beyda,* the appellate court held incidents of sexual harassment that occurred outside of the plaintiff's presence should not be automatically excluded as irrelevant. (*Id.* at p. 519.)

Here, the evidence shows plaintiff did not have any knowledge or perception of those other acts of sexual harassment, some of which had occurred over a year before she discovered them and some of which occurred at an undisclosed time, until she conducted her own investigation "to see if there were other examples" of sexual harassment at the agency. Notwithstanding plaintiff's discovery of certain incidents shortly before her employment with the agency ended, how, under those circumstances, can those incidents be probative in showing that sexual harassment conduct " 'permeated' " *plaintiff's* immediate workplace environment and was " ' "pervasive and destructive" ' " within the meaning of sexual harassment jurisprudence? (*Lyle, supra,* 38 Cal.4th at p. 289.) Relying on such incidents to prove pervasive sexual harassment in plaintiff's work environment on this record is totally inconsistent with the express language of *Lyle.*

As plaintiff acknowledged in her own testimony, the August 2004 e-mail was the only sexual harassment she claims she directly experienced up to that time. As discussed *ante,* evidence of the August 2004 e-mail, even when coupled with evidence of the few other sporadic claimed incidents of sexual harassment she witnessed over the years, her conversations with Steve O'Leary about her personal life, and her discovery of other incidents of sexual harassment that did not occur in her presence or immediate work environment, is insufficient as a matter of law to establish the existence of pervasive harassment based on gender.

## 5.

### *Evidence of claimed retaliation following the August 2004 e-mail*

At trial, plaintiff was asked: "From the date of the [August 2004 e-mail], until the date of your resignation, January 4th, 2005, you never personally experienced any sexual harassment, did you?" Plaintiff responded: "Personally, no." This admission should end the analysis about any perceived retaliation. But plaintiff's counsel nevertheless contends on appeal that her sexual harassment claim is also supported by evidence of retaliatory acts that occurred after the August 2004 e-mail.

We therefore consider whether the incidents of claimed retaliation constitute acts of harassment based on plaintiff's gender. (*Hughes, supra*, 46 Cal.4th at p. 1043.) They do not.

In her opening brief, plaintiff argues the investigation into sexual harassment in the fall of 2004 was flawed in that during the investigation, the investigator discussed the contents of the August 2004 e-mail with unidentified employees of the agency, the investigator interviewed the wrong people, he asked questions about plaintiff, including what she wore and whether she was seen outside of the workplace with Montgomery, and the agency failed to provide plaintiff with a copy of the investigator's report. Plaintiff argues that the investigation, in which she refused to participate, was a sham. Contrary to plaintiff's argument, nothing in the record supports an inference the investigation itself or any of the investigator's conduct constituted retaliation or harassment of any kind, much less *based on plaintiff's gender*, as required for such acts to be taken into consideration in our pervasiveness analysis.

Plaintiff further argues that she experienced other forms of retaliation that should be considered in the analysis of whether sexual harassment was pervasive in the workplace. She testified that after she "got an attorney involved," it seemed to her certain employees avoided her, Harrington stopped attending her meetings, and she was pulled back from attending certain meetings with certain clients. But plaintiff's own testimony reflects her perception that such acts of supposed "retaliation" were in response to her pursuing legal action against the agency, not because of her gender.

Furthermore, plaintiff testified, "in terms of meeting with clients, I was kind of pulled back a little bit from attending those meetings. That actually *had started even to happen prior to* this e-mail coming out." (Italics added.) In her opening brief, plaintiff asserts evidence showed that "[o]nly a few months *prior to the email*, Steve O'Leary had begun to lay the foundation for

[plaintiff] 'to go.' " (Italics added.) She produced evidence showing that Steve O'Leary had disagreed with some of the high marks Most had given on plaintiff's review before the August 2004 e-mail. No evidence was produced showing changes in plaintiff's work assignments and evaluations were based on her gender.

The character of such allegedly retaliatory acts starkly contrasts with the retaliatory acts based on gender that were considered further acts of sexual harassment in *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1002 [112 Cal.Rptr.2d 347]. In *Birschtein*, the harasser's "overt acts of sexual harassment (asking for dates, the 'eat you' remarks, his specifically sexual bathing fantasies) were later transmuted by plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of *retaliatory* acts—the prolonged campaign of staring at plaintiff—acts that were directly related to, indeed assertedly *grew out of*, the antecedent unlawful harassment." (*Ibid.*) The *Birschtein* court stated: "The *Accardi*[ *v. Superior Court* (1993) 17 Cal.App.4th 341 [21 Cal.Rptr.2d 292]] opinion put the matter convincingly when it characterized such a skein of harassment and complaint followed by retaliatory acts as a 'continuous manifestation of a *sex-based animus*.' [Citation.]" (*Ibid.*; see *Accardi v. Superior Court, supra*, 17 Cal.App.4th at pp. 350–351 [plaintiff was retaliated against for complaining about threats, rejection, mockery, sexual advances, and intimidation, by being excluded from certain light duty assignments that were given to injured male officers].) Hence, the court concluded the harasser's "apparent retaliatory acts were sufficiently allied with the prior acts of harassment to constitute a continuing course of unlawful conduct." (*Birschtein v. New United Motor Manufacturing, Inc., supra*, at p. 1002.)

As the evidence here fails to show any retaliatory conduct that was based on plaintiff's gender, plaintiff's evidence of the above discussed incidents of retaliation does not aid her in establishing pervasive sexual harassment.

6.

*Response to the Dissent and Conclusion*

We offer the following observations in response to the dissent. First, the dissent exaggerates the evidence in the record. Second, the dissent incorrectly states that the majority opinion concludes "nonsexual acts of retaliation that took place cannot be considered discrimination due to gender." (Dis. opn., *post*, at pp. 1363–1364.) Our opinion explains that no evidence showed the retaliatory acts claimed by plaintiff's counsel were based on her gender. We agree with the legal principle that sexual harassment can consist of conduct that is nonsexual in nature (see *Miller v. Department of Corrections* (2005) 36

Cal.4th 446, 469 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*)), but the record in this case did not contain any such evidence.

Third, we disagree with the dissent's suggestion that the facts in this case are "somewhat analogous" to the facts addressed by the Supreme Court in *Miller, supra*, 36 Cal.4th 446. (Dis. opn., *post*, at p. 1365.) They are not. In *Miller*, the court held a sexual harassment claim can be based on sexual favoritism in the workplace. (*Miller, supra*, at pp. 450–451.) In that case, a supervisor engaged concurrently in sexual relationships with three of his subordinate employees. (*Id.* at p. 466.) The supervisor "promised and granted unwarranted and unfair employment benefits" to those employees, which included the power to abuse the plaintiff employees who complained about the affairs. (*Ibid.*) The supervisor's favoritism of the employees with whom he had sexual relationships blocked the way to merit-based advancement for the plaintiffs. (*Id.* at p. 467.) One of the supervisor's paramours was permitted to harass the plaintiffs. (*Id.* at pp. 467–468.) The Supreme Court stated, "[t]his harassment, apparently retaliatory, included loss of work responsibilities, demeaning comments in the presence of other employees, loss of entitlement to a pay enhancement and to disability accommodation, and physical assault and false imprisonment. [The supervisor] explained to [one of the plaintiffs] that, because of his intimate relationship . . . , he would not protect plaintiffs. In this manner, his sexual favoritism was responsible for the continuation of an outrageous campaign of harassment against plaintiffs." (*Ibid.*) The Supreme Court concluded that the evidence in that case created a triable issue of fact as to the existence of a hostile work environment, and, in effect, reversed the summary judgment that had been entered in the defendants' favor as to the plaintiffs' sexual harassment and retaliation claims. (*Id.* at pp. 451, 466–468.)

The facts in *Miller, supra*, 36 Cal.4th 446, are far afield from the facts shown by the evidence in our record. No evidence, including plaintiff's testimony, suggests that she was subjected to a hostile work environment caused by sexual favoritism in the workplace.

Finally, the dissent cites *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707 [101 Cal.Rptr.3d 773, 219 P.3d 749] in support of the statement "[w]hile a separate claim for retaliation is not before this court, a separate claim is not always necessary." (Dis. opn., *post*, at p. 1365.) But *Roby v. McKesson Corp.* did not address that issue at all. Instead, that case involved wrongful termination, discrimination, harassment, and failure to accommodate claims related to a medical condition and disability. (*Roby v. McKesson Corp., supra*, at p. 697.) The Supreme Court held that "discrimination and harassment claims can overlap as an evidentiary matter." (*Id.* at p. 709.) Thus, as *Roby v.*

*McKesson Corp.* did not even consider a retaliation claim, it is inapplicable here. (See *Trovato v. Beckman Coulter, Inc., supra*, 192 Cal.App.4th at pp. 326–327.)

Nothing in this opinion conflicts with *Miller, supra*, 36 Cal.4th 446, or *Roby v. McKesson Corp., supra*, 47 Cal.4th 686, in any way.

Our opinion applies the holdings and analyses of *Lyle, Hughes*, and *Mokler*, which lead to the inescapable conclusion that here, the trial evidence fell "far short of 'establishing "a pattern of continuous, pervasive harassment" [citation], necessary to show a hostile working environment under FEHA.' " (*Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365, 382 [103 Cal.Rptr.3d 19].) As also discussed *ante*, "to be actionable, alleged sexual harassment cannot be occasional, isolated, sporadic, or trivial; the plaintiff must show a concerted pattern of harassment of a repeated, routine, or generalized nature." (*Id.* at p. 385.) Substantial evidence did not support such a finding.

Because we conclude the issue raised in plaintiff's appeal to be without merit, we do not need to reach the issues raised in defendants' cross-appeal.

## DISPOSITION

The judgment is affirmed. Defendants shall recover costs on appeal.

Ikola, J., concurred.

**MOORE, Acting P. J.,** Dissenting.—For years, Stephanie Crowley Brennan went along to get along at advertising agency Townsend & O'Leary Enterprises, Inc., accepting an environment where the word "bitch" was used almost routinely, Christmas party skits included demeaning roles for women, and female clients were referred to by disgusting epithets. She survived and even thrived professionally, until the blatant sexism of this workplace was directed squarely at her, and she was referred to by an executive as the "big-titted, mindless one." At that point, she complained and said enough is enough, as women are permitted to do under the law. But from the moment of her complaint, the atmosphere surrounding her job changed completely. It made no difference that she wanted to help to change the company's culture, as Steve O'Leary, the agency's owner, had asked her to do. Once she complained, she became a marked woman, and had no choice but to find other employment.

My key point of disagreement with the majority opinion is its conclusion that the nonsexual acts of retaliation that took place cannot be considered

discrimination due to gender. (Maj. opn., *ante*, at pp. 1360–1361.) The evidence of such retaliation was strong, and in my view, when added to the other evidence of a hostile work environment adduced at trial, it supported a claim of pervasive harassment sufficient to uphold the jury verdict.

Because this is a review from a judgment notwithstanding the verdict, this court must assume that every incident brought to light at trial was true. Where one or more interpretations may be given to any piece of evidence, this court must interpret it in Brennan's favor. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284–285 [73 Cal.Rptr.2d 596].)

The evidence presented at trial demonstrated that after Brennan complained about Scott Montgomery's e-mail, people at the agency stopped speaking to her. Members of management, such as agency vice-president Jim Harrington, who formerly attended Brennan's meetings, stopped attending them. Brennan was no longer included in meetings with those who had formerly been her clients. A member of her team, whom Brennan supervised, Kristin Ruiz, informed Brennan that O'Leary said the meetings were something Ruiz could "just handle" without Brennan. At trial, Brennan testified: "I'm the supervisor on the business and I just felt like I was brushed aside and made to not feel important in terms of running those accounts within the agency."

O'Leary approached Brennan's direct supervisor sometime after Brennan complained about the e-mail. The supervisor related the incident which occurred when O'Leary and the supervisor were discussing Brennan's performance review: "When we were going through each of the categories that it identified Steve felt that the review was a little too overgenerous and wanted to mark her down a couple areas that I didn't particularly agree with. I thought she did a great job, was very pleased with her performance, client was very pleased. I thought the review accurately reflected both of those opinions."

Brennan also learned of other examples of what she felt were sexual harassment at the agency, and she expressed to O'Leary that she felt there was a culture that allowed such harassment to take place. O'Leary asked her to help address the issue. Brennan suggested the company provide sexual harassment training, but this suggestion was never implemented while she was employed there. She also suggested to O'Leary that the agency speak with other employees to see if they had experienced any harassment that the agency "could draw on to help fix the culture."

But the investigator the agency hired, presumably to help "fix the culture," seemed to be investigating Brennan instead. He only interviewed a few employees selected by Patty O'Leary, O'Leary's wife and the head of human

resources. Brennan believed the process was suspect due to the employees chosen and the questions asked, which included inquiries about Brennan's manner of dress. She was also disturbed to learn that Montgomery's e-mail had been shared with some of her subordinates.

This was a clear pattern of retaliation, and while it was nonsexual in nature, it completely changed the nature of Brennan's job and her future prospects at the agency. Such retaliatory acts, although not sexual in nature, are nonetheless "a 'continuous manifestation of a *sex-based animus.*' " (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1002 [112 Cal.Rptr.2d 347]; see also *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 351 [21 Cal.Rptr.2d 292].)

While a separate claim for retaliation is not before this court, a separate claim is not always necessary. Although "discrimination and harassment are separate wrongs, they are sometimes closely interrelated, and even overlapping, particularly with regard to proof." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707 [101 Cal.Rptr.3d 773, 219 P.3d 749].) Thus, evidence of "biased personnel management actions" can be used to prove the company's "communication of a hostile message" to the plaintiff. (*Id.* at p. 708.) Such is precisely the case here. Not only did defendants fail to remedy the harassment Brennan suffered, once she complained, they made her professional life so miserable and untenable that she was eventually forced to resign. Unlike the majority, I believe the biased actions present here are "sufficiently allied with the prior acts of harassment to constitute a continuing course of unlawful conduct." (*Birchstein v. New United Motor Manufacturing, supra*, 92 Cal.App.4th at p. 1002.)

The California Supreme Court addressed somewhat analogous facts in *Miller v. Department of Corrections* (2005) 36 Cal.4th 446 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*). In that case, two female corrections officers brought a sexual harassment action after learning the warden had sexual affairs with a number of female employees. They alleged the warden sought career advancement and other favors for the women with whom he engaged in affairs. (*Id.* at pp. 452–454.) The plaintiffs were afraid to complain, because of adverse action taken against other female employees who had complained about the warden's affairs. (*Id.* at p. 454.) Reversing the lower courts, the Supreme Court held that "an employee may establish an actionable claim of sexual harassment under the FEHA by demonstrating that widespread sexual favoritism was severe or pervasive enough to alter his or her working conditions and create a hostile work environment." (*Id.* at p. 466.)

The facts here are not identical to those in *Miller*, but *Miller* demonstrates that direct, sexually based harassment is not necessary to establish a claim of

a hostile work environment. In this case, Brennan suffered no adverse consequences as long as she played the game with the "boys" at the agency, going along to get along. As soon as she complained, her circumstances changed completely. Once she decided she could no longer suffer the belittling, locker room environment quietly and without complaint, her workplace became increasingly hostile until she eventually resigned. When the overtly sex-based acts are combined with the pattern of retaliation that lasted from Brennan's complaint to her departure, those acts constitute sufficient evidence of a hostile work environment. I would therefore reverse and direct the trial court to reinstate the jury verdict in Brennan's favor.

A petition for a rehearing was denied November 9, 2011. Moore, Acting P. J., was of the opinion that the petition should be granted.