Filed 1/25/22  Rankin v. Long Beach Unified School District CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| KODY RANKIN, a minor, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LONG BEACH UNIFIED SCHOOL DISTRICT et al., <br><br> Defendants and Appellants. | B303750 <br><br> (Los Angeles County Super. Ct. No. BC615886) <br><br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> [There is no change in judgment] |

BY THE COURT:

It is ordered that the opinion filed herein on December 29, 2021, is modified as follows:

1. On page 7, final sentence of final paragraph, delete: "We begin by describing the misconduct."

2. On pages 9 and 10, delete the paragraph that begins, "The District points to several," and ends "compared to that of plaintiff's family.

There is no change in judgment.
The petition for rehearing is denied.

_____
RUBIN, P. J.          BAKER, J.          KIM. J.

Filed 12/29/21  Rankin v. Long Beach Unified School District CA2/5
Reposting correct version.  (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| KODY RANKIN, a Minor, etc.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LONG BEACH UNIFIED SCHOOL DISTRICT et al.,<br><br>Defendants and Appellants. | B303750<br><br>(Los Angeles County<br>Super. Ct. No. BC615886) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed.

McCune Harber, Dana John McCune and Dominic A. Quiller for Defendants and Appellants.

Kyle Scott Law and Kyle J. Scott; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Respondent.

_____

Plaintiff Kody Rankin was a kindergartener at an elementary school in the Long Beach Unified School District when another student ran into him during physical education class. The collision caused plaintiff to trip and hit his head on the ground. Plaintiff, by his guardian ad litem, sued the District and his P.E. teacher, Malcolm Turner, for negligence and premises liability.[1] After the trial court granted the District's summary adjudication motion on the premises liability cause of action, the jury eventually returned a verdict in plaintiff's favor. The District then moved for a new trial and for judgment notwithstanding the verdict (JNOV) on several grounds, including misconduct of counsel, insufficiency of the evidence, and evidentiary errors including the admission of certain expert testimony. The trial court granted a new trial as to damages, denied the balance of the new trial motion, and denied JNOV.

We conclude the JNOV motion was improperly denied and reverse on the ground there was insufficient evidence of negligence to support the verdict.

### FACTUAL AND PROCEDURAL BACKGROUND

#### 1. The Accident

On June 2, 2015, P.E. teacher Turner sent kindergarten students at Emerson Elementary School on a warm-up run on the playground's asphalt blacktop. He told the children to run to the fence and back in groups of six. Plaintiff took off running with other students, touched the fence, and then started to run back. On the return, with a new group of students running towards plaintiff, a boy running next to plaintiff tripped him. Plaintiff fell and hit his head on the asphalt. Plaintiff was taken to the

---

[1] Except when the context otherwise indicates, references to the District include Turner

hospital where testing revealed he had a skull fracture. The hospital released plaintiff with instructions "to be careful with his head," and that plaintiff could wear a helmet for protection.

The following year, plaintiff sued the District for negligence and premises liability. The complaint alleged the school playground's asphalt surface was a dangerous condition. Plaintiff also alleged Turner acted negligently in requiring the students "to run in a manner that was not reasonable or safe," and in failing to adequately supervise the activity.

## 2. *The District's Motion for Summary Judgment*

The District moved for summary judgment or summary adjudication of both causes of action.[2] In opposition, plaintiff submitted the declaration of civil engineer Brad Avrit. It was Avrit's opinion that the District "acted far below the standard of care" in allowing students to run on asphalt. The District objected to Avrit's qualifications, and Judge Klein sustained the objections "because Brad Avrit, a safety and engineering expert, is not competent to opine on the standard of care for elementary school teachers, his opinions lack adequate foundation, and are conclusory."

Judge Klein granted summary adjudication of the premises liability cause of action on the ground the blacktop was not a dangerous condition. As to the negligence claim, the court denied summary adjudication because "reasonable minds can differ as to how closely young students must be supervised."

---

[2] Judge Ross M. Klein presided over the summary adjudication proceedings while Judge Mark C. Kim presided over the jury trial and posttrial motions.

3

### 3. *Trial*

#### A. *Plaintiff's testimony*

At trial, plaintiff was 10 years old and testified that, on the day of the incident, P.E. teacher Turner told the students to run in groups "to a fence and back for exercise." According to plaintiff, the students "were supposed to run or jog, but then when we got really tired, we could walk." After the first group took off, plaintiff ran to the backstop, and then started running back. He was looking at Turner who was standing at the starting line when a boy running next to him, Andrew, took "maybe" seven steps to the right away from plaintiff and then veered back towards him. Andrew "kind of tripped" plaintiff, and plaintiff "fell on the ground," hitting his head. Plaintiff blacked out "for a bit." When he came to, he went to where Turner was standing and Turner called a nurse. Plaintiff told the nurse " 'Andrew tripped me and my head just started hurting a lot.' "

#### B. *Turner's testimony*

Turner testified he asked his kindergarten students to participate in a warm-up run on the blacktop. On his whistle, groups of six students at a time would start running on the blacktop 120 feet to a fence, and then run back. Plaintiff and Andrew were in the same group, and as students were running back, Turner observed in his peripheral vision plaintiff colliding with another student and falling. Although the school had a grassy area and an outdoor area with a rubber ground surface, Turner instructed the students to run on the blacktop. According to Turner, the students "were not allowed to be on" the grass because "it was still growing."

4

### C.  *The District's expert, Dr. Fraisse*

At trial, the District called expert witness Dr. Robert Fraisse, a retired school superintendent, school administrator, teacher, and coach.  Dr. Fraisse testified the Physical Education Framework for California Public Schools is the blueprint California school districts use for drafting lesson plans.  It was Dr. Fraisse's opinion that the running activity in which plaintiff participated was consistent with the standards set by the section on P.E. for kindergarten students.  The "commonsense supervision standard" requires teachers to always be "within sight and sound of their students," and, here, Turner met that standard.

On cross-examination, plaintiff's counsel quoted from Dr. Fraisse's deposition where he was asked whether Turner should have instructed the students to run "on the grass surface immediately adjacent to the asphalt surface."  Dr. Fraisse responded, "I'm not sure if the grass was sufficient to run that activity and I don't think in all cases grass is as soft a landing than asphalt.  Depends on the watering system and so forth."  Dr. Fraisse also testified that he could not opine on why Turner "made that decision . . . without knowing what the field looked like in June," when the accident happened.

### D.  *Plaintiff's expert, Brad Avrit*

Plaintiff's expert Avrit testified at trial, reiterating his prior statements made in opposition to summary judgment.[3]  He

---

[3]  The District moved in limine to exclude Avrit's testimony on the same grounds it had raised in support of summary judgment.  The record does not reveal whether the trial court ruled on the motion.

listed his qualifications as a licensed civil engineer and president of a company that does "construction management work," "safety engineering services," "property assessments," and "forensic engineering." Avrit described the "outdoor area" at the school as including a lawn and a blacktop. He opined that Turner should have chosen to hold the running activity on grass or "a rubberized track surface."

As he did in the summary judgment proceedings, Avrit again offered that "the way this activity was designed and the children were asked to conduct it . . . was uncontrolled and significantly increased the risk of a collision or loss of balance . . . ." Avrit also testified that plaintiff and his classmates were not "properly supervised."

The District's counsel objected, and the court sustained the objection "as to supervision" on the ground it was beyond the scope of Avrit's expertise. The court expressly declined to strike any of Avrit's remaining testimony. Despite the court's ruling, Avrit proceeded to testify that the running activity was not "reasonably safe" because "the activity is required to be [] directly supervised." When the District's counsel renewed his objection, the court reversed course, allowing Avrit to testify on supervision based on his experience investigating "school safety incidents."

### E.    The Verdict

The jury returned a verdict against the District and Turner, finding they had been negligent. The jury apportioned 100 percent of the fault to the District and Turner and awarded plaintiff $5.75 million in damages.

### F.    Motions for New Trial and JNOV

The District moved for a new trial on several grounds: the evidence of negligence and damages was legally insufficient,

evidentiary errors deprived the District of a fair trial, and misconduct by plaintiff's counsel required reversal. The court granted the motion for new trial only as to damages and conditioned it upon plaintiff's rejection of the court's remittitur reducing damages to $1.25 million. Plaintiff rejected the remittitur. The trial court's minute order did not discuss the other grounds for new trial, thus impliedly rejecting them. The court limited the new trial to damages.

The District also moved for JNOV due to insufficiency of the evidence. The court denied JNOV. The District and Turner timely appealed.

### G. Attorney Misconduct

One of the grounds on which the District seeks reversal is misconduct of counsel. Although we do not decide the case on that ground, canon 3D(2) of the California Code of Judicial Ethics requires a judicial officer to take appropriate corrective action when he or she has knowledge of attorney misconduct.[4] We begin by describing the misconduct.

---

[4] Canon 3D(2) of the California Code of Judicial Ethics provides: "Whenever a judge has personal knowledge, or concludes in a judicial decision, that a lawyer has committed misconduct or has violated any provision of the Rules of Professional Conduct, the judge shall take appropriate corrective action, which may include reporting the violation to the appropriate authority." The Advisory Committee commentary to Canon 3D(2) further explains appropriate corrective action may include "writing about the misconduct in a judicial decision."

First, plaintiff's trial counsel Keith J. Bruno made the following statements during closing argument.[5]

> "I don't know what ultimately you'll do, but I'll find out soon. And no matter what happens, if nothing else, I'll get that piece of paper with your names on it and I'll know how much you appraised [plaintiff's] brain and how much you appraised what happened here. Your signatures will be on that and I'll give it to them. I'll hand it to them and they'll know from you, from citizens of Long Beach, what this was worth.
>
> When I say I love my job, those are the times I do. I've seen jurors do the right thing and deliver full justice time and time again. And those are the jurors, when the judge says you can wait out in the hallway, those are the jurors that hug the family and hug the kids and stay and talk and say we hope plaintiff – we want him to get better. We hope this brings you some peace. And then I've seen the opposite, too. The justice isn't done and the jurors take off down the hallway and leave as quickly as they can. One is better than the other."

After closing argument, Juror No. 2 gave the trial court a letter stating, "During final closing statements and instructions, I discovered that my name and decision will be public information and provided to the parties. The entire time I believed my decision would remain anonymous. . . . I now know why [plaintiff's] counsel didn't excuse me from the case . . . I strongly believe counsel's decision to keep me is because of my ties to the

---

[5]     Bruno represented plaintiff throughout the trial court proceedings. He is not attorney of record on appeal.

8

community and that this would create a bias in his favor." Juror No. 2 was observed by plaintiff's other attorney, Kyle Scott, to be "crying in front of other jurors" in the hallway. The court excused Juror No. 2 and appointed an alternate.

By these comments, trial counsel directly appealed to the jurors' personal self-interest when he said he would ensure plaintiff's parents knew each juror's name and verdict, and suggested that plaintiff's parents would either be grateful to the jury, giving out hugs, or angry at them, causing the jurors fearfully "take off down the hallway and leave as quickly as they can." "An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality. [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796; see *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 179 [counsel's argument was misconduct where counsel "appealed directly to the jurors' personal passions and prejudices"].)

Second, plaintiff's trial counsel made repeated references in opening, closing, and cross-examination to the District's unsuccessful motion for summary judgment in violation of Code of Civil Procedure section 437c, subdivision (n)(3). Third, plaintiff's trial counsel urged the jury to find that Turner was using his cell phone at the time of the accident when there was no evidence of such and counsel's statements violated the trial court's express ruling prohibiting the argument.

The District points to several additional acts of misconduct: plaintiff's trial counsel (1) implored the jury to see plaintiff as their own son, (2) asked the jury to teach the District a lesson, (3) repeatedly commented on the District's insurance, and

9

(4) emphasized the District's financial resources compared to that of plaintiff's family.

## *DISCUSSION*

The District contends on appeal that the trial court should have granted JNOV or, in the alternative, a new trial on all issues for the same reasons offered in its posttrial motions — that is, misconduct of counsel, insufficiency of the evidence, and evidentiary errors including in the admission of expert testimony. As we discuss, we conclude as a matter of law the evidence was insufficient to demonstrate negligence on the part of the District and the trial court erred when it denied the District' JNOV.

We begin our analysis by considering the standard of review for denial of JNOV and the law on school district liability for negligence.

## 1.    *Standard of Review for Denial of JNOV*

" ' "The purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation." [Citation.]' [Citation.]" (*Trujillo v. North County Transit Dist*. (1998) 63 Cal.App.4th 280, 284.) We review the denial of JNOV to determine "whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict." (*Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336, 1345.)

The testimony of a single witness may be substantial evidence, including the testimony of an expert. But, "when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions . . . not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' . . . . [Citations.]" (*Wise v. DLA Piper LLP*

10

*(US)* (2013) 220 Cal.App.4th 1180, 1191–1192; see *Jennings v. Palomar Pomerado Health Systems, Inc*. (2003) 114 Cal.App.4th 1108, 1117–1118 (*Jennings*); *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 314 (*Talcum Powder Cases*).) "Therefore, an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Jennings,* at p. 1117.)

## 2.     *School District Liability for Negligence*

To establish negligence, a plaintiff must prove duty, breach, causation, and damages. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

"As a general matter there is no duty to act to protect others from the conduct of third parties. [Citation.] One exception to that general rule is found in the 'special relationship' doctrine. A defendant may owe an affirmative duty to protect another from the conduct of third parties, or to assist another who has been attacked by third parties, if he or she has a 'special relationship' with the other person." (*Morris v. De La Torre* (2005) 36 Cal.4th 260, 269.)

A school district has a special relationship with students "arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.' [Citations.] Because of this special relationship, imposing obligations beyond what each person generally owes others . . . the duty of care owed by school personnel includes the duty to use reasonable measures to

11

protect students from foreseeable injury at the hands of third parties acting negligently or intentionally. This principle has been applied in cases of employees' alleged negligence resulting in injury to a student by another student . . . . [Citation.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869–870 (*Hart*).)**6**

### 3. *Sufficiency of the Evidence*

The District contends the proximate cause of plaintiff's injury was classmate Andrew's actions rather than any act or omission by teacher Turner. Plaintiff, in turn, attributes Andrew's collision with him to Turner's inadequate supervision and unsafe design of the run. He relies on expert Avrit's testimony that Turner could have prevented the accident if he had more actively supervised the activity. Avrit also testified the design of the run increased the potential for collisions and Turner's decision to hold the run on asphalt increased the risk of serious injury. We consider each of the factors identified by plaintiff to determine whether any of them constitutes

---

**6** In *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, the Supreme Court clarified the applicable framework for determining whether a defendant has a duty to protect a plaintiff from harm caused by a third party. The high court established a two-part inquiry: "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108] to determine whether relevant policy considerations counsel limiting that duty." (*Id.* at p. 209.) The District does not assert the *Rowland* factors limited its duty to plaintiff.

12

substantial evidence to support a finding that Turner's acts or omissions caused plaintiff's injury or breached a duty to plaintiff.

### A. Lack of Supervision

It was Avrit's opinion at trial that Turner failed to adequately supervise the children because he was standing away from the run and setting up for the next activity rather than paying close attention to the students.[7] According to Avrit, Turner should have stood in the middle of the activity, directed the children where to run, and corrected their behavior. We conclude Avrit's testimony did not constitute substantial evidence of inadequate supervision resulting in plaintiff's injury.

Our Supreme Court has described a school district's duty of supervision as follows: " 'While school districts and their employees have never been considered insurers of the physical safety of students, California law has long imposed on school authorities a duty to " 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection. [Citations.]" ' [Citations.] The standard of care imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care " 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances.' " [Citations.] Either a

---

[7] For purposes of our decision, we need not decide whether the trial court erred in allowing plaintiff's expert to testify on the standard of care for school supervision. The court so ruled after it initially stated that Avrit was unqualified to testify on that topic and after Judge Klein found Avrit unqualified to opine on the standard of care for elementary school teachers on summary adjudication.

13

total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision.'" (*Hart, supra,* 53 Cal.4th at p. 869.)

The duty to supervise is not unremitting: The "constant supervision of all movements of pupils at all times . . . is clearly not the law." (*Woodsmall v. Mt. Diablo Unified School Dist.* (1961) 188 Cal.App.2d 262, 267 (*Woodsmall*).) "A contrary conclusion would unreasonably 'require virtual round-the-clock supervision or prison-tight security for school premises, . . .'" (*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1459.)

In school supervision cases, appellate courts have required more than the mere assertion that additional supervision would have prevented the unanticipated injury. "When an injury occurs despite a defendant's efforts to provide security or supervision, it is relatively easy to claim that, ipso facto, the security or supervision provided was ineffective. Without more, such claims fail." (*Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352, 1370 (*Thompson*).) "To establish causation, plaintiff must demonstrate that a particular omission caused the injury." (*Id.* at p. 1370.)

In *Thompson,* the plaintiff was attacked by two other students in a school restroom during the lunch period. (*Thompson, supra,* 107 Cal.App.4th at p. 1358.) The evidence demonstrated a campus monitor looked into the restroom just before the fight. He returned two minutes later when he noticed students going towards the restroom. (*Id.* at p. 1360.)

The plaintiff presented evidence from a certified protection professional and security consultant who criticized the school's

14

security measures and opined that the plaintiff would not have been attacked if there had been effective supervision in the area during the lunch period. The court held this type of expert declaration was insufficient to establish a cause of action for negligence because "while expert criticism of the defendant's security measures may establish abstract negligence, an expert's speculative and conjectural conclusion that different measures might have prevented an injury cannot be relied upon to establish causation." (*Thompson, supra,* 107 Cal.App.4th at pp. 1372–1373.)

In *Woodsmall, supra,* 188 Cal.App.2d at page 263, a student suffered injuries when another student pushed him into a basketball pole. No teachers or other supervisory personnel were on the playground at the time. The court found "the uncontroverted evidence leads to the conclusion that supervision would have made no difference as the proximate cause of the accident was the pupil who pushed [the plaintiff]." (*Id.* at pp. 264-265; see also *Wright v. City of San Bernardino High Sch. Dist.* (1953) 121 Cal.App.2d 342, ["the danger which suddenly developed could not reasonably be said to have resulted from or been caused by the absence of the teacher."].)

By contrast, a school may be found to be negligent where it failed to provide any supervision for conduct that could have been prevented. (*Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741 [the teachers did not hear or see the 10-minute slap boxing match, which attracted a crowd of approximately 30 spectators, and which took place within a few feet of the gym, where two teachers were sitting inside]; *Forgnone v. Salvador Union Elementary School Dist.* (1940) 41 Cal.App.2d 423, 426–427 [no supervision in a classroom during the lunch hour where

15

child's arm was twisted and fractured]; *Tymkowicz v. San Jose Unified School Dist.* (1957) 151 Cal.App.2d 517, 520 [no supervision in yard where a child held his breath while another squeezed him tightly around the chest until he lost consciousness].) A school may also be found negligent where supervision was provided but the supervisor allowed the dangerous conduct to continue. (*Buzzard v. East Lake School Dist.* (1939) 34 Cal.App.2d 316, 318–319 [students allowed to ride bicycles where other students played at recess].) Those circumstances did not exist in this case.

Instead, as in *Thompson, Woodsmall,* and *Murphy,* "the uncontroverted evidence leads to the conclusion that supervision would have made no difference." (*Woodsmall, supra,* 188 Cal.App.2d at p. 264.) The evidence is that the accident occurred suddenly and greater supervision would not have prevented it. Avrit acknowledged he did not know what Turner could have done to stop the collision between the boys.[8] Plaintiff

---

[8] At trial, Avrit testified as follows:

Q And at your deposition, you both agreed that Andrew veering over to the right and veering back to the left occurred in a matter of seconds, right?
A Yes
Q Now, what can Mr. Turner have done – well, was there any evidence that Andrew announced to Kody that he was going to veer to the right and come back?
A No
Q So given this occurred in a matter of seconds, Andrew did not forewarn anybody he was going to do this, what could Mr. Turner have done to stop this collision?

testified the accident occurred "pretty quickly" and it "surprise[d]" him.

Like the plaintiff in *Thompson,* plaintiff here presented expert testimony criticizing Turner's supervision and opining that it could have been better. But there was no evidence that better supervision—that is, Turner standing in the middle of the run and directing each of the approximately dozen students running at any one time along a 180-foot route—would have prevented Andrew from tripping plaintiff.[9] Avrit's "speculative and conjectural conclusion that different measures might have prevented an injury cannot be relied upon to establish causation." (*Thompson, supra,* 107 Cal.App.4th at pp. 1372–1373.) Plaintiff failed to show a causal link between his injury and any negligent failure to supervise by Turner.

### B.    *The Design of the Run*

Avrit next opined the run was unsafe because Turner instructed the children to run directly at each other, which increased the risk of a head-on collision or could cause them to lose their balance while trying to avoid a collision with an oncoming student.

First, it was undisputed plaintiff's injury was not caused by a head-on collision. Second, the record was bereft of evidence

---

A    I don't know. I don't know enough about exactly what happened. He would have to be there to be able to say whether or not Andrew would be the – left his direct path and for what reason. We can't tell because there isn't an eyewitness that saw the reasoning behind why Andrew veered off.

[9]    Turner testified each group consisted of approximately six children. Avrit estimated one leg of the route to be 180 feet.

17

that Andrew was trying to avoid an oncoming student when he collided with plaintiff. Avrit acknowledged there was no evidence that Andrew was trying to avoid an oncoming student since "[t]he teacher didn't see it. So we don't have an eyewitness and we don't have testimony from Andrew." Turner testified he only saw the students fall from his peripheral vision but did not believe Andrew was trying to avoid an oncoming student when he tripped plaintiff. Turner further testified without contradiction that students ran at varying speeds, with some taking up to five minutes to walk the lap, which created additional space between the runners.

Plaintiff testified he and Andrew had reached the backstop, touched it, and had turned around for the final leg of their run. He testified Andrew then veered over to the right by approximately seven steps and then veered back into plaintiff, tripping him. Plaintiff did not testify that he observed Andrew was attempting to avoid one or more oncoming students at the time of the collision. He instead testified it happened suddenly and "it was a surprise."

Because the predicate to Avrit's opinion—that Andrew was trying to avoid an oncoming student—relied purely on speculation or an assumption unsupported by the record, Avrit's opinion that the design of the run was unsafe due to oncoming runners "cannot rise to the dignity of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135–1136; *Talcum Powder Cases, supra,* 37 Cal.App.5th at p. 314.)

Nor does the evidence show that Avrit's suggestions for a better-designed run would have prevented Andrew from tripping plaintiff. Avrit suggested the children run in an oval or in lanes

18

separated by cones. There was no evidence that this design likely would have prevented Andrew from tripping plaintiff as the two boys would still have been running side by side. Avrit also suggested the children be released in intervals, spread out, and told to run to a different stopping point. These measures would not have prevented the accident since Turner did release the children in intervals and in small groups to spread them out. Plaintiff testified Andrew took approximately seven steps away from him (and presumably seven steps back towards him) before tripping him. Given this testimony, Avrit's testimony that the children should have been separated by a greater distance to avoid collision was speculative. As to the children running to a different stopping point, that would not have prevented the accident because it is undisputed a head-on collision did not occur and Andrew would still have run by plaintiff's side.

### C. *The Use of Asphalt*

We next turn to Avrit's criticism of Turner's decision to direct the children run on asphalt rather than grass or rubberized track, thus "increas[ing] the risk of a more serious injury if they were to fall for any reason." The District contends Avrit's testimony was improperly admitted because the issue of whether asphalt is a dangerous condition was summarily adjudicated by Judge Klein. Plaintiff asserts the District misapprehends his argument at trial. He acknowledges, "Asphalt itself is not a dangerous condition." According to plaintiff, he did not argue that the asphalt itself was unsafe but that the manner in which it was used was unsafe.[10] His theory at

---

[10] Although plaintiff acknowledges asphalt is not a dangerous condition, he continues to assert the run should not have been

trial was that Turner's decision to hold the run on asphalt fell below the standard of care due to the high risk of falls caused by how the activity was designed and the risk of serious injury should a young child fall on asphalt rather than a softer surface.

In support, Plaintiff relies on Avrit's opinion regarding the safety of the run in general. Avrit briefly testified he reached his opinion after conducting a site inspection, reviewing the depositions and other evidence, and considering the "standards by which . . . recess and such is supposed to be conducted." Aside from his conclusion the run was unsafe, Avrit did not testify how the run fell below the standard of care. He failed to identify what standards he used or how the design of the run deviated from these standards. This is not substantial evidence to support a finding that Turner's conduct fell below the standard of care. (*Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 945, fn. 15 ["An expert opinion that does not contain 'a reasoned explanation illuminating why the facts have convinced the expert' need not be relied on"]; see Evid. Code, § 802 ["A witness testifying in the

---

held on asphalt because the run was not designed to be safe on that surface. In the summary adjudication ruling that the asphalt did not create a dangerous condition, Judge Klein rejected this argument and Avrit's testimony that supported it. Judge Klein reasoned, "To the extent that Plaintiff claims that asking kindergarteners to run in a group on such a surface, the condition of the property itself is not implicated. The Court has sustained objections to the Avrit declaration which purported the surface is dangerous. He had no foundation for his characterization of students 'running in a chaotic and uncontrolled fashion.' Even if the Court accepted that as competent, it does not transform an ordinary asphalt surface into a 'dangerous condition.' " Plaintiff did not via cross appeal challenge Judge Klein's ruling.

form of an opinion may state . . . the reasons for his opinion and the matter . . . upon which it is based . . ."].)

On the other hand, the District presented expert testimony regarding the "blueprint" used by California school districts for drafting lesson plans for physical education. Its expert, Dr. Fraisse, identified how the standards were established, set out what the standards were, and testified how the run was consistent with these standards.

We are mindful of the deferential standard of review for denial of a motion for JNOV: we must affirm if substantial evidence — contradicted or uncontradicted — supports the jury's conclusion. After our review of the evidence, we conclude that it was legally insufficient for the jury to have found for plaintiff on causation and breach of duty. The trial court improperly denied the District's JNOV motion. Given our conclusion, we need not consider the remaining arguments raised by the District on appeal.

### *DISPOSITION*

The trial court's denial of the District's JNOV motion is reversed. The trial court is directed to enter an order granting the District's JNOV motion. The trial court's order granting the District's motion for a new trial on damages is vacated as moot. The parties are to bear their own costs on appeal.


RUBIN, P. J.

WE CONCUR:


21

BAKER, J.

KIM, J.